DAVID MORASCINI *v.* COMMISSIONER OF PUBLIC SAFETY ET AL.
(15270)

Peters, C. J., and Callahan, Borden, Berdon, Norcott, Katz and Palmer, Js.

[15] See footnote 6.

Argued November 28, 1995—officially released May 7, 1996

*Robert W. Werner*, associate attorney general, with whom were *Carolyn K. Querijero* and *Margaret Q.*

*Chapple*, assistant attorneys general, and, on the brief, *Richard Blumenthal*, attorney general, for the appellants (defendants).

*Martin B. Margulies*, with whom were *Philip D. Tegeler* and, on the brief, *Martha Stone*, for the appellee (plaintiff).

*Karen K. Buffkin* and *Pedro E. Segarra* filed a brief for the city of Hartford as amicus curiae.

*Alan Neigher* and *Judith M. Trutt* filed a brief for Real Art Ways et al. as amici curiae.

*Mary-Michelle U. Hirschoff* filed a brief for the Connecticut Conference of Municipalities as amicus curiae.

CALLAHAN, J. The sole issue in this appeal is whether the trial court properly concluded that General Statutes § 7-284[1] is unconstitutional as applied to a rap music concert at the plaintiff's nightclub and as it would apply thereafter to concerts and other forms of expressive conduct. We conclude that the statute is not unconstitutional either on its face or as it applied to the plaintiff.

The plaintiff is David Morascini, who, in 1990, was the owner and operator of the Palace Cafe and Restaurant (Palace), a nightclub located in Stafford Springs. The defendants are Nicholas A. Cioffi, the commissioner of public safety and the commanding officer for the divi-

---

[1] General Statutes § 7-284 provides: "Police protection at places of amusement. When police protection is necessary or required at any boxing bout or wrestling match, place of public amusement, sport contest or hockey, baseball or basketball game, or any other exhibition or contest, which is being held or is to be held in any municipality, the amount of such protection necessary shall be determined and shall be furnished by (1) the chief or superintendent of the police department in any municipality having an organized or paid police department or (2) the commanding officer of the state police troop having jurisdiction over the municipality in any municipality having a resident state trooper. Any such protection shall be paid for by the person or persons operating, conducting or promoting such game, exhibition or contest."

sion of the Connecticut state police, Colonel Ray Ouellette, the deputy commissioner of the division of state police, Lieutenant Peter Plante, the commanding officer of Troop C of the Connecticut state police, and Major John Jacewicz, the eastern district commander of the Connecticut state police.

The following facts are undisputed. On October 8, 1990, the plaintiff contracted with the rap music group 2 Live Crew to perform at the Palace on October 12, 1990. In the late afternoon of October 10, the plaintiff contacted the state police barracks in Stafford Springs seeking to obtain a number of metal detectors for use at the performance. It was only then that the state police learned of the imminent 2 Live Crew appearance at the Palace.

On the morning of October 11, with only a short time remaining before the 2 Live Crew concert, the state police acted to ensure that the concert would be safe for all concerned. The police initially met with the fire marshall to discuss emergency lights, exits and occupancy limits for the Palace. They then contacted the highway department to arrange for barricades to keep concertgoers safe from traffic on adjacent streets and called area hospitals to advise them of the event. The state police also toured the Palace to ensure compliance with the fire code.

In the course of their preparations, the state police received information from police departments in other states that had previously hosted 2 Live Crew concerts. This information included three newspaper articles sent by the Dallas, Texas police department relating to a "furniture throwing melee at an aborted 2 Live Crew concert"[2] in Dallas that had caused over $100,000 in

---

[2] That concert was aborted when 2 Live Crew arrived nearly three hours late for a scheduled concert and then refused to perform because of a monetary dispute with club management.

damage. The articles reported that it was necessary to call approximately fifty police officers in riot gear to the scene when the private security force of twenty-seven guards was unable to control the crowd. The state police also received an investigative report compiled by the chief of the Westerly, Rhode Island police department. That report detailed the public safety concerns that had followed 2 Live Crew to the various cities on its tour. The report noted that "[e]ach community contacted stressed that they had indeed received information as to large appearances and were more concerned as to problems outside rather than problems inside." The report also indicated that 2 Live Crew's promoter represented to the Westerly chief of police that "a large amount of weapons" had been confiscated from 2 Live Crew patrons at previous concerts. Lastly, the report revealed that two of the members of 2 Live Crew had been arrested on June 10, 1990, during a performance in Hollywood, Florida.[3]

The state police also received information as to the possibility that a street gang would attend the concert and cause problems. In addition, there were no advance ticket sales for the show, and neither the police nor the plaintiff knew how many people would seek to attend the concert. This uncertainty caused concern regarding traffic problems and the potential negative reactions of those who might arrive after the 310 available tickets for the show had been sold.

In light of the above information and the related public safety concerns, state police officials recommended to the then commissioner of public safety, Bernard Sullivan, that state police be assigned to the Palace for the concert. Sullivan agreed with the recommendation and

---

[3] Additionally, numerous press inquiries were made prior to the Stafford Springs performance and, according to the state police, "[t]here was . . . every indication that the press was going to be there in force."

determined, pursuant to § 7-284, the amount of necessary police services. Initially, Sullivan intended to bill the plaintiff for those police services in advance of the concert, but later, after seeking and receiving the advice of the state attorney general, he agreed not to bill the plaintiff until after the performance.

The concert ultimately was held as scheduled with assigned state police and auxiliary troopers present. As in Dallas, concertgoers became agitated when 2 Live Crew arrived approximately two hours later than scheduled and temporarily walked out after a monetary dispute with management. Starting at approximately 1:30 a.m. on October 13, however, the group finally performed without serious incident. Approximately one month later, the plaintiff received a bill for $1991.74 for the police services that had been provided at the concert.

The plaintiff refused to pay the bill and subsequently filed this action seeking: (1) a declaratory judgment that § 7-284 is unconstitutional under both the state[4] and the federal constitutions as applied to the October, 1990 2 Live Crew concert and to other concerts in the future; (2) a declaratory judgment that § 7-284 does not apply to concerts and other events not specifically enumerated therein; (3) a preliminary and permanent injunction prohibiting the state police from collecting fees for police services rendered at the 2 Live Crew concert and at future activities involving protected speech; and (4) an award of the plaintiff's costs and attorney's fees under 42 U.S.C. § 1988. The defendants filed a counterclaim, alleging that, pursuant to § 7-284,

---

[4] Because the plaintiff has not presented this court with a separate analysis of his right to freedom of speech under the state constitution, we confine our analysis to the application of the first amendment to the United States constitution. See, e.g., *State* v. *Nixon*, 231 Conn. 545, 550 n.4, 651 A.2d 1264 (1995).

they had provided the plaintiff with police services for which they were entitled to be paid.

The parties filed motions for summary judgment. The trial court denied the defendants' motion but granted the plaintiff's motion, concluding that "the application of § 7-284 to performances of music and other protected speech, including the concert in this case, treats 'the First Amendment as a privilege to be bought rather than a right to be enjoyed'; *Invisible Empire Knights of the Ku Klux Klan* v. *West Haven*, [600 F. Sup. 1427, 1434 (D. Conn. 1985)]; and is therefore unconstitutional." *Morascini* v. *Commissioner of Public Safety*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CV910392693 (February 17, 1995). The defendants appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (b) (2), which provides for a direct appeal to this court "in any matter where the superior court declares invalid a state statute or a provision of the state constitution." We reverse the judgment of the trial court.

I

We first address whether the trial court correctly concluded that § 7-284 applies to concerts.[5] By its terms, § 7-284 requires the proper police official[6] to furnish

---

[5] The plaintiff claims on appeal that the trial court could have ruled in his favor by determining, as a matter of statutory construction, that § 7-284 does not apply to concerts and other expressive activities.

[6] Section 7-284 provides that this official should be either "(1) the chief or superintendent of the police department in any municipality having an organized or paid police department or (2) the commanding officer of the state police troop having jurisdiction over the municipality in any municipality having a resident state trooper. . . ."

The trial court indicated that because Stafford Springs had neither its own police department nor a resident state trooper at the time of the concert, it did not believe that the defendants fell within the terms of the statute. The trial court, at the urging of both parties, however, declined to decide

necessary police protection, to be paid for by the promoter, at "any boxing bout or wrestling match, place of public amusement, sport contest or hockey, baseball or basketball game, or any other exhibition or contest, which is being held or is to be held in any municipality . . . ." We conclude that the Palace is a "place of public amusement," that concerts are "exhibition[s]" within the meaning of § 7-284 and that the statute is therefore applicable to concerts.

"The word 'amusement' means anything that amuses, as an entertainment or spectacle . . . . *Radcliffe* v. *Query*, 153 S.C. 76, 150 S.E. 352 [1929]." 4 Am. Jur. 2d 121 n.1, Amusements and Exhibitions § 1. "A statute providing for the regulation of places of amusement includes all classes of public exhibitions, such as are usually conducted upon a stage for the observation and amusement of the public. Hence, a place of public amusement where concerts are given upon a stage is within its terms. *New York* v. *Eden Musee American Co.*, 102 N.Y. 593, 8 N.E. 40 [1886]." Id. "Theaters and concert halls are places of public amusement . . . ." Id., pp. 121–22, citing *People ex rel. McShane* v. *Keller*, 96 Misc. 92, 161 N.Y.S. 132 (1916). A "place of amusement" is "[a] place to which people resort for diversion or pleasure, some being exhibitive and others participative, the former being represented by theaters, stadiums, and so forth and the latter by skating rinks, bowling alleys and so forth." Ballentine's Law Dictionary (3d Ed. 1969). We conclude that a nightclub that stages performances for the entertainment of its patrons is a "place of public amusement" as that phrase is commonly understood.

Moreover, concerts, by their very nature, are "exhibition[s]" as that phrase is commonly understood. To

the case on that ground. Because the plaintiff has not raised this claim as an alternative ground for affirmance on appeal, we need not decide it.

exhibit is "[t]o show or display . . . ." Black's Law Dictionary (6th Ed. 1990). An exhibition is "[a] fair; a show; a presentation of works of art or of trade and commerce for viewing by the public or a class of persons." Ballentine's Law Dictionary (3d Ed. 1969). We conclude that musical concerts are "exhibition[s]" insofar as they are "presentation[s] of works of art . . . for viewing by the public." Id. Because the Palace is a "place of public amusement" and the 2 Live Crew concert was an "exhibition," we conclude that § 7-284 is applicable to the concert at issue in this case.[7]

## II

Having determined that § 7-284 is applicable to concerts, we turn to the plaintiff's first amendment challenge to its constitutionality. Our analysis of the constitutionality of § 7-284 begins with the premise that " 'a validly enacted statute carries with it a strong presumption of constitutionality, [and that] those who challenge its constitutionality must sustain the heavy burden of proving its unconstitutionality beyond a reasonable doubt.' " *Fleming* v. *Garnett,* 231 Conn. 77, 88, 646 A.2d 1308 (1994). As in any first amendment case, we must initially decide whether the activity at issue is protected by the first amendment. In this case, the parties are in agreement, and we agree, that "[m]usic, as a form of expression and communication, is protected under the First Amendment." *Ward* v. *Rock Against*

---

[7] This case is distinguishable from *West Haven* v. *Dean,* 6 Conn. Cir. Ct. 629, 292 A.2d 263 (1971), on which the plaintiff relies. In *Dean,* the Appellate Division of the Circuit Court concluded that a restaurant that provided nightly music for its patrons did not fall within the terms of § 7-284. It is not inconsistent to say that a nightclub falls within the definition of "place of public amusement" when hosting a concert while a restaurant that provides music for dining and dancing does not. Moreover, because the court in *Dean* relied on the absence of a trial court finding that "police protection [was] necessary or required" in reaching its conclusion, its determination of the definition of what constitutes a "place of public amusement" is dictum. Id., 632.

*Racism*, 491 U.S. 781, 790, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989). We therefore must determine whether § 7-284 is constitutional. We conclude that, as interpreted, it is.[8]

"Expression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions." *Clark* v. *Community for Creative Non-Violence*, 468 U.S. 288, 293, 104 S. Ct. 3065, 82 L. Ed. 2d 221 (1984). "Describing the ordinance as a time, place, and manner regulation is, of course, only the first step in our inquiry. This Court has long held that

---

[8] At the outset, we note that this case is distinguishable from those cases cited by the parties that analyze statutes requiring potential speakers to pay a fee in order to be permitted to utilize public property to air their views and concerns publicly. See, e.g., *Forsyth County* v. *Nationalist Movement*, 505 U.S. 123, 112 S. Ct. 2395, 120 L. Ed. 2d 101 (1992) (parade permit fee); *Stonewall Union* v. *Columbus*, 931 F.2d 1130 (6th Cir. 1991) (requirement that parade sponsors prepay for those police officers determined to be necessary to control traffic along parade route); *Invisible Empire Knights of the Ku Klux Klan* v. *West Haven*, supra, 600 F. Sup. 1427 (requirement that applicants for public demonstration permits post bond for city's costs of police protection at public demonstrations of more than twenty-five persons). In those cases, the speakers sought to use quintessential public forums that have over time served as outlets for the exchange of ideas. In places "historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks . . . the government's ability to permissibly restrict expressive conduct is very limited." *United States* v. *Grace*, 461 U.S. 171, 177, 103 S. Ct. 1702, 75 L. Ed. 2d 736 (1983).

Moreover, cases concerning parade permit fees are distinguishable because such fees are a necessary prerequisite to the use of the public property for speech purposes, thus making the fee a prior restraint on speech. When speech is predicated upon the payment of a fee, there is a "heavy presumption" against the constitutional validity of the fee. *Forsyth County* v. *Nationalist Movement*, supra, 505 U.S. 130. The disfavor with which prior restraints are treated is a product of the first amendment's concern with the "the danger of censorship." Id., 131. No such danger of censorship existed in the present case because the fee was not payable until after the concert had taken place. Prior restraints are present only if a regulation gives "public officials the power to deny the use of a forum in advance of actual expression." *Ward* v. *Rock Against Racism*, supra, 491 U.S. 795 n.5; *Southeastern Promotions, Ltd.* v. *Conrad*, 420 U.S. 546, 553, 95 S. Ct. 1239, 43 L. Ed. 2d 448 (1975); *TJ's South, Inc.* v. *Lowell*, 895 F. Sup. 1124 (N.D. Ind. 1995). No such power was exercised in the present case.

regulations enacted for the purpose of restraining speech on the basis of its content presumptively violate the First Amendment. See *Carey* v. *Brown*, 447 U.S. 455, 462–463, and n. 7 [100 S. Ct. 2286, 65 L. Ed. 2d 263] (1980); *Police Dept. of Chicago* v. *Mosley*, 408 U.S. 92, 95, 98–99 [92 S. Ct. 2286, 33 L. Ed. 2d 212] (1972). On the other hand, so-called 'content-neutral' time, place, and manner regulations are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication. See *Clark* v. *Community for Creative Non-Violence*, [supra, 293]; *City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U.S. 789, 807 [104 S. Ct. 2118, 80 L. Ed. 2d 772] (1984); *Heffron* v. *International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 647–648 [101 S. Ct. 2559, 69 L. Ed. 2d 298] (1981)." *Renton* v. *Playtime Theatres, Inc.*, 475 U.S. 41, 46–47, 106 S. Ct. 925, 89 L. Ed. 2d 29, reh. denied, 475 U.S. 1132, 106 S. Ct. 1663, 90 L. Ed. 2d 205 (1986). We must first resolve whether the constitutional requirements for a valid time, place or manner restriction were met by the application of § 7-284 to the plaintiff in this instance, and then determine whether § 7-284 may be applied in a constitutional manner to similar expressive activity in the future.

A

Section 7-284 provides for the imposition of the cost of police services "necessary or required at any . . . place of public amusement . . . or . . . exhibition . . . ." As applied to the specific facts of this case, § 7-284 required the state police to provide whatever amount of police protection was "necessary or required" to ensure the public safety and to charge the plaintiff, as the promoter of the concert, for the costs incurred in doing so. The threshold question before us is whether the assessment of costs pursuant to § 7-284 in this instance is " '*justified* without reference to the

content of the regulated speech.'" (Emphasis in original.) *Renton* v. *Playtime Theatres, Inc.*, supra, 475 U.S. 48. If so justified, the statute is classified as "content-neutral" for first amendment purposes. If not so justified, it is classified as "content-based." The significance of this distinction is that content-based statutes or regulations are "presumptively invalid" and the government must justify them as necessary to serve a *compelling* state interest. Such statutes or regulations must be narrowly drawn to achieve that end. *Police Dept. of Chicago* v. *Mosley*, supra, 408 U.S. 96. Content-neutral regulations, on the other hand, must only "serve a substantial governmental interest" and must "not unreasonably limit alternative avenues of communication." *Renton* v. *Playtime Theatres, Inc.*, supra, 47.

Deciding whether a particular regulation may be justified without reference to the content of the regulated activity is sometimes a difficult task. As the United States Supreme Court has stated, "the 'principal inquiry in determining content-neutrality . . . is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys.' *Ward* v. *Rock Against Racism*, [supra, 491 U.S. 791]. See *R.A.V.* [v. *St. Paul*, 505 U.S. 377, 386, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992)] ('The government may not regulate [speech] based on hostility—or favoritism—towards the underlying message expressed'). The purpose, or justification, of a regulation will often be evident on its face. See *Frisby* v. *Schultz*, 487 U.S. 474, 481 [108 S. Ct. 2495, 101 L. Ed. 2d 420] (1988). But while a content-based purpose may be sufficient in certain circumstances to conclude that a regulation is content-based, such purpose is not necessary in all cases. Cf. *Simon & Schuster*, [*Inc.* v. *New York State Crime Victims Board*, 502 U.S. 105, 117, 112 S. Ct. 501, 116 L. Ed. 2d 476 (1991)] (' "illicit legislative intent is not the sine qua non of a violation of the First Amend-

ment" ') (quoting *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue*, 460 U.S. 575, 592 [103 S. Ct. 1365, 75 L. Ed. 2d 295] (1983). Nor will the mere assertion of a content-neutral purpose be enough to save a law which, on its face, discriminates based on content. [*Arkansas Writers' Project, Inc.* v. *Ragland*, 481 U.S. 221, 231–32, 107 S. Ct. 1722, 95 L. Ed. 2d 209 (1987)]; *Carey* v. *Brown*, [supra, 447 U.S. 464–69].

"As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based. See, e.g., *Burson* v. *Freeman*, 504 U.S. 191, 197 [112 S. Ct. 1846, 119 L. Ed. 2d 5] (1992) ('[w]hether individuals may exercise their free-speech rights near polling places depends entirely on whether their speech is related to a political campaign'); *Boos* v. *Barry*, 485 U.S. 312, 318–19 [108 S. Ct. 1157, 99 L. Ed. 2d 333] (1988) (plurality opinion) (whether municipal ordinance permits individuals to 'picket in front of a foreign embassy depends entirely upon whether their picket signs are critical of the foreign government or not'). By contrast, laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral. See, e.g., *Members of City Council of Los Angeles* v. *Taxpayers for Vincent*, [supra, 466 U.S. 804] (ordinance prohibiting the posting of signs on public property 'is neutral—indeed it is silent—concerning any speaker's point of view'); *Heffron* v. *International Society for Krishna Consciousness, Inc.*, [supra, 452 U.S. 649] (State Fair regulation requiring that sales and solicitations take place at designated locations 'applies evenhandedly to all who wish to distribute and sell written materials or to solicit funds')." *Turner Broadcasting System* v. *Federal Communications Commission, Inc.*, 512 U.S. 622, 643, 114 S. Ct. 2445, 129 L. Ed. 2d 497, reh. denied, 512 U.S. 1278, 115 S. Ct. 30, 129 L. Ed. 2d 927 (1994).

Whether or not the legislature's enactment of a particular statute appears to have been actually motivated by the desire to suppress particular views, the statute will be considered content-neutral and will likely pass constitutional muster if it is " *'justified* without reference to the content of the regulated speech.' " (Emphasis in original.) *Renton* v. *Playtime Theatres, Inc.,* supra, 475 U.S. 48. The "fundamental principle" that underlies the first amendment's concern with content-based speech regulations is "that 'government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views.' " Id., 48–49. If a regulation does not operate to encourage certain speech while discouraging other speech on the basis of its content, the regulation may be characterized as content-neutral for first amendment purposes. Id.

The United States Supreme Court has held that a regulation aimed at the "secondary effects" of speech rather than its content will be classified as content-neutral. Id., 47–48. However, "[l]isteners' reactions to speech are not the type of 'secondary effects' " that will classify a regulation as content-neutral.[9] *Boos* v. *Barry,* supra, 485 U.S. 321 (plurality opinion); see *Forsyth County* v. *Nationalist Movement,* 505 U.S. 123, 134, 112 S. Ct. 2395, 120 L. Ed. 2d 101 (1992) (listeners' reaction to speech not content-neutral basis for regulation). The defendants argue that § 7-284 is content-neutral because it is unrelated to the content of the plaintiff's expression. The plaintiff, on the other hand, argues that *Forsyth County* "directly controls this appeal, because there, as here, the challenged ordinance required the administrator to charge for assigned police services

---

[9] In *Renton* v. *Playtime Theatres, Inc.,* supra, 475 U.S. 48, the "secondary effect" targeted by the statute was the preservation of the neighborhood from the blight anticipated to be caused by an influx of "adult" theatres.

when assignment decisions were based on predictions of audience violence." We agree with the defendants.

In *Forsyth County*, the ordinance at issue required groups wishing to use public property and roads for private purposes to obtain a permit before doing so. Id., 126. The ordinance further provided that every permit applicant "shall pay in advance for such permit, for the use of the County, a sum not more than $1,000.00 for each day such parade, procession, or open air public meeting shall take place." (Internal quotation marks omitted.) Id. In addition, the ordinance provided that the county administrator shall "adjust the amount to be paid in order to meet the expense incident to the administration of the Ordinance and to the maintenance of public order in the matter licensed." (Internal quotation marks omitted.) Id., 127. In January, 1989, the Nationalist Movement, a local affiliate of the Ku Klux Klan, sought a permit to hold a demonstration in opposition to the national holiday commemorating the birthday of Martin Luther King, Jr. Before it would issue the permit, the county required a $100 prepaid fee based on the county administrator's time in issuing the permit. Id. The Nationalist Movement brought a facial challenge to the Forsyth County ordinance.

The court concluded that the fee authorized by the Forsyth County ordinance, as construed by the county, was "based on the content of the speech." Id., 134. The court held that "[t]he fee assessed will depend on the administrator's measure of the amount of hostility likely to be created by the speech based on its content. . . . The costs to which [the] petitioner refers are those associated with the public's reaction to the speech. Listeners' reaction to speech is not a content-neutral basis for regulation." Id.

Although the court in *Boos* and *Forsyth County* rejected the claim that audience "reaction to speech"

is a content-neutral justification, it has never retreated from its holding in *Renton* that regulations aimed only at the "secondary effects" of speech rather than the speech itself may be properly characterized as content-neutral. *Renton* v. *Playtime Theatres, Inc.*, supra, 475 U.S. 47. The plaintiff reads *Forsyth County* to classify as content-based any regulation that allows for even after-the-fact billing for police services at any event containing expressive activity when the assessment of the need for police protection is based upon audience behavior or informed predictions thereof. We disagree. Under *Forsyth County*, a fee that is related in some way to the behavior of a speaker's audience is only a content-based restriction on speech when the behavior is a "reaction *to the speech.*" (Emphasis added.) *Forsyth County* v. *Nationalist Movement*, supra, 505 U.S. 134. There is a distinction between charging a fee based on the unreceptive and potentially violent audience reaction to a Ku Klux Klan demonstration in opposition to the Martin Luther King, Jr. holiday, as was the case in *Forsyth County*, and charging a fee based on potential audience misbehavior that is neither incited by, nor a reaction to, the *message* being conveyed by a particular speaker or speakers. In the former case, the fee permits a "heckler's veto" and limits public discourse to those subjects unlikely to stir the cauldron of public passions. In the latter case, the fee does not threaten to allow the government to " 'grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views,' " because neither the government's attitude toward, nor the crowd's reaction to, the views espoused is a factor in the assessment of the fee. *Renton* v. *Playtime Theatres, Inc.*, supra, 48–49.

In the present case, there is no indication in the record that the assignment of police officers to the 2 Live Crew concert at the Palace was determined by the

potential reaction of anyone to any message conveyed by 2 Live Crew during their appearance. In fact, no lyric or message of 2 Live Crew was ever cited to justify the police presence at the Palace. In their memorandum to the trial court in support of their motion for summary judgment, the defendants summarized the facts indicating the content-neutrality of Sullivan's decision to deploy state police as follows: "It is undisputed that the decision to assign police protection to the 2 Live Crew performance was based upon extensive intelligence information received by the defendants prior to the event. This information indicated that violence had occurred at previous 2 Live Crew performances, that security personnel assigned to previous 2 Live Crew performances had confiscated weapons from patrons of the events, that street gangs had been known to attend 2 Live Crew performances, and that other previous 2 Live Crew performances had been relatively uneventful as the result of the presence of large numbers of police officers at the events. Furthermore, the state police were legitimately concerned about traffic and crowd control because of the small occupancy load of the Palace Cafe, the fact that there had been no advance ticket sales for the event, and the event had received a great deal of media attention. Therefore, it was impossible to accurately predict the number of people who might appear to purchase tickets for the event and be refused admission." The defendants again summarized the factors impacting upon the decision to assign police to the concert later in that same memorandum: "The defendants' concerns about public safety were amply justified by the intelligence information which they had previously received, indicating that violence had occurred at previous 2 Live Crew performances, that knives, guns and narcotics had been seized from patrons attending such performances, and that street gangs have been known to follow the group. In

addition, the defendants' actions were based upon a justifiable concern about traffic congestion and crowd control, especially in light of the limited seat[ing] capacity of the plaintiff's nightclub and the fact that there were no advance ticket sales and there was therefore no reliable means of predicting the number of people who would seek admission to the performance." Sullivan, in his deposition testimony, had identified these same factors as those that had impacted upon his decision to assign police officers to the concert.[10]

---

[10] Bernard Sullivan, the commissioner of public safety at the time of the 2 Live Crew concert, described the factors that led to his decision to police the concert: "Some of the rationale was the fact that this group—what was it—2 Live Crew, I think was the name of it, was coming to Stafford Springs, that they were very well known at the time. I had seen some articles on them, that they had determined that in prior locations where they had played concerts, there had been public safety problems, fights breaking out in a crowd, things of that nature. There had been a lot of publicity generated about that.

"Based on that, [Major John Jacewicz] expressed to me his concerns about the fact that, whether or not we could assure public safety in and around that event that evening. He felt it necessary to assign police officers there, which I concurred with."

Sullivan was then asked whether he shared the concerns expressed by Lieutenant Peter Plante in his deposition testimony about "the audience reaction to 2 Live Crew." Sullivan, who had not received input from Plante about the need for police at the 2 Live Crew concert, responded:

"A. I don't remember that exact wording being used by Major Jacewicz. I know he did mention, as I just stated, that in prior concerts there had been public safety issues, where fights had broken out in the crowd. Whether it was expressed as a reaction to the group or just the crowd itself, I couldn't remember.

"Q. Did you have knowledge of the reputation of the group at the time you made the decision?

"A. Somewhat, yes. As best I can recall, they were a very popular group, rap music, drew a very young, exciting crowd, and there had been some problems in prior areas. I had seen myself in the media, on TV, or read in the paper where with prior concerts by this group, there was fighting breaking out in the crowd. Police had to be brought in to break up disturbances, things of that nature.

"Q. Do you remember anything else Mr. Jacewicz told you?

"A. No, it was pretty much the fact that they had contacted some other towns that had concerts where this group performed, or there had been prior public safety concerns, fights breaking out.

From Sullivan's deposition testimony, it is apparent that he based his assignment of police personnel on the following factors: (1) a riot that had broken out at a recent 2 Live Crew concert in Dallas without the group having played a note or sung a lyric because of 2 Live Crew's refusal to perform as scheduled; (2) the large quantities of concealed weapons that had been confiscated from 2 Live Crew fans at previous concerts;[11] (3) concerns regarding excessive pedestrian and vehicular traffic in the areas surrounding the Palace; (4) reports that a street gang would possibly attend the concert; (5) the uncertain size of the crowd due to the failure of the plaintiff to sell advance tickets; and (6) the potentially hostile reactions of those persons unable to purchase one of the limited number of tickets.[12] None of

"Again, that is one of the biggest things, I guess, that occurred. I can't recall whether or not they indicated there was drinking involved or anything like that, because with a lot of different types of concerts, you get kids drinking or you get them using drugs, and what have you. But there had been prior public safety concerns, and because of that, he felt it necessary to provide police service, and I concurred with that."

[11] The commissioner of public safety was entitled to base his decisions on the experiences of other cities that had hosted 2 Live Crew concerts. "The First Amendment does not require a city . . . to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." *Renton* v. *Playtime Theatres, Inc.*, supra, 475 U.S. 51–52.

[12] While agreeing that Sullivan considered many content-neutral factors in determining whether to invoke § 7-284, both dissents emphasize that in response to the plaintiff's request for admissions, the defendants admitted that when determining the necessity for police presence at the concert, Sullivan had considered the nature and content of 2 Live Crew's lyrics, " 'insofar as the nature or content [of the lyrics] might provoke or incite the crowd and thereby cause public safety concerns.' " We disagree both with Justice Katz' conclusion that this admission requires that we affirm the trial court's grant of summary judgment for the plaintiff and with Justice Norcott's conclusion that this admission warrants a remand to the trial court for a factual determination. The defendants admitted only that Sullivan had considered whether the content of the music *"might* provoke or incite the crowd." (Emphasis added.) There is no evidence in this record, and the plaintiff does not argue, that Sullivan found that the music *would* incite the crowd or that the determination of the number of police necessary to ensure

these considerations is content-based under the United States Supreme Court's first amendment jurisprudence because each is " '*justified* without reference to the content of the regulated speech.' " (Emphasis in original.) *Renton* v. *Playtime Theatres, Inc.*, supra, 475 U.S. 48. Because the police presence at the 2 Live Crew concert was "justified without reference to the content" of 2 Live Crew's performance, we conclude that § 7-284 was applied to the plaintiff in a content-neutral fashion.

### B

Having determined that the statute was applied in a content-neutral manner, we must next determine whether the application of the statute was "designed to serve a substantial governmental interest." *Renton* v. *Playtime Theatres, Inc.*, supra, 475 U.S. 47. We conclude that it was. As interpreted by the United States Supreme Court, this facet of the test to determine the constitutionality of a content-neutral regulation or statute is not particularly onerous. The governmental interest in protecting citizens from unwelcome noise; *City Council of Los Angeles* v. *Taxpayers for Vincent*, supra, 466 U.S. 806; in maintaining parks in an attractive and intact condition; *Clark* v. *Community for Creative Non-Violence*, supra, 468 U.S. 296; and in attempting to preserve the quality of urban life; *Renton* v. *Playtime Theatres, Inc.*, supra, 50; have all been classified as sufficiently significant to warrant a content-neutral regulation of speech.

The state's interest in properly policing the 2 Live Crew concert in this instance was twofold. Pursuant to

---

the public safety was actually affected by any message conveyed by the music. In fact, Sullivan's deposition testimony is to the contrary. Therefore, we need not remand the case to the trial court for a determination of the effect of the defendants' admission. Sullivan's deposition testimony makes clear that the police protection provided was " '*justified* without reference to the content of the regulated speech.' " (Emphasis in original.) *Renton* v. *Playtime Theatres*, supra, 475 U.S. 48.

§ 7-284, the state sought to ensure public safety at the Palace before, during and after the concert and sought to be compensated by the promoter of the event for its expenses in doing so, rather than having the taxpayers foot the bill for a privately sponsored for-profit venture. We view the government's interest in protecting the safety of its citizens to be equal to or greater than its interest in protecting citizens from unwelcome noise, maintaining the physical appearance of parks or preserving the quality of life, all of which have satisfied the substantial governmental interest test in assessing the constitutionality of a content-neutral regulation. Moreover, the government's interest in raising and preserving revenue has, in the first amendment context, been classified as both "critical"; *Minneapolis Star & Tribune Co.* v. *Minnesota Commissioner of Revenue*, supra, 460 U.S. 592; and "important." *Forsyth County* v. *Nationalist Movement*, supra, 505 U.S. 136; *Arkansas Writers' Project, Inc.* v. *Ragland*, supra, 481 U.S. 231. Either one of the state's interests, standing alone, would be sufficient to justify a content-neutral regulation of speech.

We also find no constitutional defect in the method employed by the legislature to further the government's interests. When the regulation is content-neutral, the means chosen by the government to further its substantial interests "need not be the least restrictive or least intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.' *United States* v. *Albertini*, [472 U.S. 675, 689, 105 S. Ct. 2897, 86 L. Ed. 2d 536 (1985)]; see also [*Clark* v.] *Community for Creative Non-Violence*, supra, [468 U.S.] 297." *Ward* v. *Rock Against Racism*, supra, 491 U.S. 798–99. We conclude that the achievement of the government's substantial interests in both public safety

and financial responsibility are properly served by § 7-284. Absent § 7-284, state and local governments would be without authority to seek compensation for police services furnished to private entrepreneurs. The governmental interest in maintaining public order consequently would be achieved less effectively in the absence of § 7-284 because its absence would place financial strain on various state and local police departments. The city of Hartford, for example, billed promoters of privately sponsored events approximately $427,000 for police services in the 1994–1995 fiscal year pursuant to § 7-284.[13] Even if only a fraction of these events involves arguably expressive conduct, it is likely that without § 7-284 public safety would suffer because many cities and towns would be forced by financial circumstances to curtail the number of police officers assigned to events that presently are covered adequately because of § 7-284.

C

Once we have determined a regulation to be content-neutral and designed to serve a substantial governmental interest, we must consider whether the regulation "unreasonably limit[s] alternative avenues of communication." *Renton* v. *Playtime Theatres, Inc.*, supra, 475 U.S. 47. Regarding this final prong of the test, the present case is analogous to *Ward* v. *Rock Against Racism*, supra, 491 U.S. 781. There, the New York City ordinance in question did not ban expression, just as § 7-284 does not ban expression. It required only that groups seeking to perform in a Central Park bandshell utilize a designated sound technician and sound equipment provided by New York City. In upholding the ordinance, the

[13] The city of Hartford indicates that in the absence of § 7-284, the city would have to pay out of taxpayer dollars not only what is currently being billed to private promoters, but also the additional costs that would be incurred because the city would have to pay the police officers on a time and one-half basis rather than the "private job (straight) time rate."

United States Supreme Court held that "[t]he final requirement, that the guideline leave open ample alternative channels of communication, is easily met. Indeed, in this respect the guideline is far less restrictive than regulations we have upheld in other cases, for it does not attempt to ban any particular manner or type of expression at a given place or time. . . . Rather, the guideline continues to permit expressive activity in the bandshell, and has no effect on the quantity or content of that expression beyond regulating the extent of amplification. That the city's limitations on volume may reduce to some degree the potential audience for [the] respondent's speech is of no consequence, for there has been no showing that the remaining avenues of communication are inadequate." Id., 802.

The plaintiff claims that the costs imposed on him by virtue of § 7-284 will foreclose him and other promoters from an avenue of expression. The plaintiff's argument is essentially that no fee may be imposed upon any person or group seeking to exercise first amendment rights because some may be unable to pay the fee and consequently be unable to exercise those rights. Such a claim, while appealing in the abstract, is contrary to precedent. It is well established that speakers may be billed for those costs incurred by the government as a result of the exercise of first amendment rights. In *Cox* v. *New Hampshire*, 312 U.S. 569, 577, 61 S. Ct. 762, 85 L. Ed. 1049 (1941), for instance, the court assessed the validity of a parade permit fee designed " 'to meet the expense incident to the administration of the [a]ct and to the maintenance of public order in the matter licensed.' " In upholding the fee, the court stated that "[t]here is nothing contrary to the Constitution in the charge of a fee limited to the purpose stated." Id. Other cases have led to a similar result. See, e.g., *National Awareness Foundation* v. *Abrams*, 50 F.3d 1159, 1165 (2d Cir. 1995) (fees imposed in order "to meet the

expenses incident to the administration of a regulation and to the maintenance of public order in the matter regulated are constitutionally permissible"). Furthermore, just as the first amendment did not compel the government in *Renton* to ensure that adult theatres or other speech-related businesses "will be able to obtain sites at bargain prices"; *Renton* v. *Playtime Theatres, Inc.*, supra, 475 U.S. 54; the first amendment does not guarantee concert promoters the right to promote concerts without incurring overhead costs. Lastly, the plaintiff and other purveyors of alcohol in a nightclub setting are under a legal duty to provide for the safety of their patrons. Regs., Conn. State Agencies § 30-6-A24. The fact that an activity occurring within a nightclub involves allegedly expressive conduct does not relieve the operator of the club from the discharge of that duty. A declaratory judgment that § 7-284 is unconstitutional, therefore, would not appreciably increase the ability of the plaintiff or other nightclub concert promoters to exercise first amendment rights because they, in any case, would ultimately be responsible for any expenses connected with security.

We conclude that § 7-284, as applied to the plaintiff, is content-neutral, is tailored to serve a substantial governmental interest and does not unreasonably limit alternative avenues of communication. For these reasons, we hold that § 7-284 was applied to the plaintiff in a manner consistent with the first amendment.

### III

Our conclusion that § 7-284 was applied to the plaintiff in a content-neutral manner does not necessarily guarantee that § 7-284 will not be applied to expressive activities in a content-based manner in the future. It is well settled, however, that we may "add interpretive gloss to a challenged statute in order to render it constitutional. 'In construing a statute, the court must search

for an effective and constitutional construction that reasonably accords with the legislature's underlying intent.' *Calfee* v. *Usman*, 224 Conn. 29, 33, 616 A.2d 250 (1992); *State* v. *Campbell*, 224 Conn. 168, 176, 617 A.2d 889 (1992), cert. denied, 508 U.S. 919, 113 S. Ct. 2365, 124 L. Ed. 2d 271 (1993)." *State* v. *Indrisano*, 228 Conn. 795, 805–806, 640 A.2d 986 (1994). In order to avoid potential constitutional infirmity in the application of § 7-284 to future expressive activity, we interpret § 7-284 to prohibit the police from billing a promoter for police services at an "exhibition" or a "place of public amusement" when protected speech is involved and when the necessity for the police services billed is attributable to the hostile reaction of the crowd *to the content of the speaker's message.*[14] In other words, we interpret § 7-284 consistently with the decision in *Forsyth County*, which holds that audience reaction to *the message* conveyed by expressive activity may not serve as the justification for a fee associated with such activity. See *Forsyth County* v. *Nationalist Movement*, supra, 505 U.S. 134. To be constitutional, § 7-284 cannot be interpreted to countenance a "heckler's veto," i.e., to permit the suppression of a particular message because a hostile crowd disagrees with it. Id. We interpret § 7-284 to allow for the consideration of only those actions or potential actions of the audience that are unrelated to the message or messages conveyed by the expressive activity. Section 7-284, therefore, allows promoters of events involving expressive activity to be charged only for police services unrelated to the content of the speech such as traffic congestion; see id., 135 n.12 (closing of streets); *Boos* v. *Barry*, supra, 485 U.S. 321 (interference with ingress or egress); and crowd size. *Forsyth County* v. *Nationalist Movement*, supra,

---

[14] This is not to say that if potential listener reaction to the expressive conduct necessitates additional police services, the police may not bill for *any* services. The bill, however, must be limited to those services unrelated to listener reaction to the speech.

135 n.12 (large crowds); *Cox* v. *New Hampshire*, supra, 312 U.S. 577 (same). Further, § 7-284 allows the consideration of other factors concerning audience behavior, such as possible alcohol and drug use by the audience, possession of weapons by the audience and past instances of violence at similar events, but only if those instances of violence were unrelated to the message of the speaker.

The plaintiff also claims that § 7-284 impermissibly vests police officials with standardless discretion regarding if and when to charge for police services. We disagree. Section 7-284 provides that the police "shall" provide necessary police services and that the promoter "shall" pay for such services. There is no leeway in the statute for the police official to bill those groups with which he or she disagrees and not to bill groups that he or she supports. Contrary to the discretionary fee that was the subject of *Forsyth County*,[15] § 7-284 requires the promoter to pay the costs incurred for necessary police services.[16]

Finally, there is no merit to the plaintiff's claim that § 7-284 vests public officials with limitless and standardless discretion in deciding how much police protection is necessary at an event. The statute specifically limits the amount of protection to that "necessary or required." There is no evidence in the record that any

---

[15] Although the language of the ordinance in *Forsyth County* indicated that the fee might have been mandatory, the court relied on the county's own interpretation of the statute, which allowed the fee to be reduced or waived based on "the whim of the administrator." *Forsyth County* v. *Nationalist Movement*, supra, 505 U.S. 133. We interpret § 7-284 to allow no such discretion.

[16] Having concluded that the charge for police services in this case was imposed on the plaintiff in a content-neutral manner and having interpreted § 7-284 to require mandatory charges in the future, we need not address the plaintiff's allegation that Sullivan, as chief of the Hartford police department prior to his term as commissioner of public safety, had applied § 7-284 in a content-based manner.

state police official has in the past abused his or her authority under the statute by providing excessive police services in order to suppress any person's freedom of expression or that any official will do so in the future. Furthermore, any party who believes that the fee charged for security is unreasonable or not commensurate with the needs of a particular event is free to challenge that fee in the Superior Court.[17] Moreover, we interpret § 7-284 to allow only for postevent billing to eliminate the danger that police officials will be able to suppress disfavored speech by assigning an unnecessary number of police officers to an event or by charging an unreasonable fee and requiring payment in advance, thereby constituting a prior restraint. See *Forsyth County* v. *Nationalist Movement*, supra, 505 U.S. 130.

We conclude that § 7-284, as applied to the plaintiff, is consistent with the first amendment. We also conclude that there is nothing in § 7-284, as interpreted, that is inconsistent with first amendment protections.

The judgment is reversed and the case is remanded to the trial court with direction to deny the plaintiff's motion for summary judgment and to grant the defendants' motion for summary judgment.

In this opinion PETERS, C. J., BORDEN and PALMER, Js., concurred.

NORCOTT, J., dissenting. I agree with parts I and III of the majority opinion, and generally with its exposition of the relevant first amendment law principles in part II. I do not agree, however, that, in light of those principles, summary judgment should be granted in

---

[17] In this case, the plaintiff limited his challenge to the constitutionality of the application of § 7-284 to the 2 Live Crew concert and to future expressive activity. He did not claim that, as a matter of fact, the police services provided at the 2 Live Crew concert were unnecessary or that the amount of the fee charged therefor was unreasonable.

favor of the defendants. In my view, the evidence before us gives rise to an issue of fact regarding whether the application of General Statutes § 7-284 in this case was " *'justified* without reference to the content [of the music to be performed at the concert]' "; (emphasis in original) *Renton* v. *Playtime Theatres, Inc.,* 475 U.S. 41, 48, 106 S. Ct. 925, 89 L. Ed. 2d 29 (1986); which determination is a critical component of the ultimate question whether § 7-284 as applied violated the plaintiff's first amendment rights. I believe, therefore, that the proper course is to reverse the trial court's grant of summary judgment in favor of the plaintiff, to deny the defendants' motion for summary judgment, and to remand the case to the trial court for further proceedings. Accordingly, I respectfully dissent.

"The standards governing our review of a trial court's decision to grant a motion for summary judgment are well established. 'Practice Book § 384 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Miller* v. *United Technologies Corp.,* 233 Conn. 732, 744–45, 660 A.2d 810 (1995). " 'Issue of fact' encompasses not only evidentiary facts in issue but also questions as to how the trier would characterize such evidentiary facts and what inferences and conclusions it would draw from them." *United Oil Co.* v. *Urban Redevelopment Commission,* 158 Conn. 364, 379, 260 A.2d 596 (1969). " 'A material fact' is simply a fact which will make a difference in the result of the case . . . ." *Yanow* v. *Teal Industries, Inc.,* 178 Conn. 262, 268, 422 A.2d 311 (1979). Summary judgment "is appropriate only if a fair and reasonable person could conclude only one way. . . . The movant must show that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue

of material fact. . . . [A] summary disposition . . . should be on evidence which a jury would not be at liberty to disbelieve and which would require a directed verdict for the moving party. . . . [A] directed verdict may be rendered only where, on the evidence viewed in the light most favorable to the nonmovant, the trier of fact could not reasonably reach any other conclusion than that embodied in the verdict as directed." (Citations omitted; internal quotation marks omitted.) *Miller* v. *United Technologies Corp.*, supra, 751–52. "[S]ummary judgment procedure is particularly inappropriate where the inferences which the parties seek to have drawn deal with questions of motive, intent and subjective feelings and reactions." (Internal quotation marks omitted.) *Batick* v. *Seymour*, 186 Conn. 632, 646–47, 443 A.2d 471 (1982). "The burden of proof is on the moving party and the standards of summary judgment are strictly and forcefully applied." *Miller* v. *United Technologies Corp.*, supra, 751.

On appeal, the defendants claim that § 7-284 as applied to the plaintiff is a valid time, place and manner regulation. It is well established that expression protected by the first amendment, which concerts are; *Ward* v. *Rock Against Racism*, 491 U.S. 781, 790, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989); may be subjected to reasonable time, place and manner restrictions. Id., 791; *Renton* v. *Playtime Theatres, Inc.*, supra, 475 U.S. 47; *Clark* v. *Community for Creative Non-Violence*, 468 U.S. 288, 293, 104 S. Ct. 3065, 82 L. Ed. 2d 221 (1984). The first step in determining whether such a restriction is valid is to determine whether it is "content-neutral" or "content-based." A regulation is content-neutral if it is " *'justified* without reference to the content of the regulated speech.' " (Emphasis in original.) *Renton* v. *Playtime Theatres, Inc.*, supra, 48, quoting *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771, 96 S. Ct. 1817, 48 L.

Ed. 2d 346 (1976). The "secondary effects" of speech are considered content-neutral justifications for regulation; *Renton* v. *Playtime Theatres, Inc.*, supra, 47–48; however, a listener's "emotive" reaction to speech, such as a crowd's hostile reaction to a controversial demonstration, is not considered such a "secondary effect." *Forsyth County* v. *Nationalist Movement*, 505 U.S. 123, 134, 112 S. Ct. 2395, 120 L. Ed. 2d 101 (1992); *Boos* v. *Barry*, 485 U.S. 312, 321, 108 S. Ct. 1157, 99 L. Ed. 2d 333 (1988). A content-neutral time, place and manner restriction may be upheld if it is designed to serve a substantial governmental interest and does not unreasonably limit alternative avenues of communication. *Renton* v. *Playtime Theatres, Inc.*, supra, 47. Content-based restrictions, however, are presumptively invalid and may be upheld only if necessary, and narrowly drawn to serve a compelling governmental interest. *Boos* v. *Barry*, supra, 321.

The defendants argue that the undisputed facts demonstrate that in applying § 7-284 to the plaintiff, then commissioner of public safety, Bernard Sullivan, relied on only content-neutral justifications, and that because the statute is designed to serve a substantial governmental interest and does not unreasonably limit alternative means of communication, it therefore constitutes a valid time, place and manner restriction as applied to the plaintiff. The plaintiff argues to the contrary that the undisputed facts demonstrate that Sullivan's application of § 7-284 was based on the content of the music to be performed and that it cannot survive the strict scrutiny applicable to a content-based regulation. Although I agree with the defendants and with the majority that certain undisputed facts before us require the conclusion that Sullivan, in assigning police services to the concert, relied on several content-neutral factors; see part II A of the majority opinion; I am not persuaded, in light of other evidence in the record, that there is

no genuine factual issue as to whether, and if so, to what extent, his decision also rested on a content-based justification, namely, his predictions regarding the effect of the content of the music on the crowd.[1]

The evidence that raises this question is the admission by the defendants that "the decision to assign police at the Palace Cafe's 2 Live Crew concert took into account the nature of the music and the content of the lyrics, insofar as the nature and content might provoke or incite the crowd and thereby cause public safety concerns." The trial court made no express finding regarding the import of this admission.[2] The majority, emphasizing the word "might" in the admission, concludes that it may be read to mean that, although Sullivan considered the content of the music and its effect on the crowd, he did not actually rely on that concern in making his assignment of police to the concert and, therefore, the admission does not defeat summary judgment for the defendants. See footnote 12 of the majority opinion. While I agree that a reasonable trier of fact could construe the admission this way, I do not believe that it is the only reasonable interpretation of it. The admission could also reasonably be con-

---

[1] Whether the application of § 7-284 to the plaintiff was justified without reference to the content of the music is clearly a material issue, for I am not convinced, and the majority does not suggest that, if § 7-284 was applied in a content-based manner, it would survive strict scrutiny.

[2] The trial court concluded that § 7-284, "as applied in the present case, is a content-based regulation." Its conclusion appears to have been based on Sullivan's having considered intelligence reports discussing the behavior of crowds at 2 Live Crew concerts in other cities. The majority points out, however, and I agree, that not every regulation aimed at audience behavior is content-based. Such a consideration is content-based only if the targeted audience behavior, the cost of controlling which is to be passed on to the speaker or promoter, is related to the message conveyed in the protected speech. See part II A of the majority opinion. I agree with the majority that there is no indication that Sullivan's concern with audience misbehavior drawn from the intelligence reports was related to the audience's reaction to messages conveyed in the music.

strued to mean that Sullivan based his determination of the police services "necessary or required" at the concert on what he determined was a potential for the lyrics to incite the crowd to behavior that might jeopardize the public safety, which would not constitute a content-neutral secondary effect of the music.[3] At the summary judgment stage, where a trier of fact reasonably could reach more than one conclusion on a material issue of fact, the proper course for the court is not to resolve the issue by choosing among the conclusions reasonably supported by the evidence, but, instead, to deny summary judgment. See *LaFond* v. *General Physics Services Corp.*, 50 F.3d 165, 174 (2d Cir. 1995) (trial court should not resolve ambiguities or draw inferences in favor of movant for summary judgment); *T.S.* v. *Ridgefield Board of Education*, 808 F. Sup. 926, 929 (D. Conn. 1992) (in determining whether there are unresolved issues of material fact to be tried at summary judgment stage, " 'all reasonable inferences and any ambiguities are drawn in favor of the non-moving party' "); *Yanow* v. *Teal Industries, Inc.*, supra, 178 Conn. 269 (function of court in ruling on summary judgment is only to determine whether genuine issue as to material fact exists, not to decide it if it does); *United Oil Co.* v. *Urban Redevelopment Commission*, supra, 158 Conn. 379 (noting that where inferences other than those drawn by trial court were permissible, genuine issue existed as to ultimate facts). Because I believe that the evidence presents a genuine issue of material fact, namely, whether, and to what extent, the application of § 7-284 to the plaintiff rested on a content-based justification, I would deny summary judgment and

---

[3] I do not agree with the dissenting opinion of Justice Katz that the fact that Sullivan consulted the content of the lyrics is sufficient to render the statute as applied content-based, regardless of whether he formed and relied on any predictions as to the effect of the content on the crowd in assigning police services to the concert.

remand the case for further proceedings. Accordingly, I respectfully dissent.

KATZ, J., with whom BERDON, J., joins, dissenting. I agree with part I of the majority opinion that General Statutes § 7-284 applies to the 2 Live Crew concert at issue in this case. I also agree that the concert is protected under the first amendment to the United States constitution. I disagree, however, with part II A of the majority opinion that, in this case, the defendants' determination of whether to assign police protection and how much to assign to the concert held at the plaintiff's club was " '*justified* without reference to the content' of 2 Live Crew's [music]." (Emphasis added.) Therefore, I respectfully dissent.

The United States Supreme Court has long held that "regulations enacted for the purpose of restraining speech on the basis of its content presumptively violate the First Amendment." *Renton* v. *Playtime Theatres, Inc.*, 475 U.S. 41, 46–47, 106 S. Ct. 925, 89 L. Ed. 2d 29, reh. denied, 475 U.S. 1132, 106 S. Ct. 1663, 90 L. Ed. 2d 205 (1986). Content-based regulations can be upheld only if they are "necessary to serve a compelling state interest and . . . [are] narrowly drawn to achieve that end." (Internal quotation marks omitted.) *Boos* v. *Barry*, 485 U.S. 312, 321, 108 S. Ct. 1157, 99 L. Ed. 2d 333 (1988). "On the other hand, so-called 'content-neutral' time, place, and manner regulations are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." *Renton* v. *Playtime Theatres, Inc.*, supra, 47. "Content-neutral" speech restrictions are those that " 'are *justified* without reference to the content of the regulated speech.' " (Emphasis in original.) Id., 48, quoting *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771, 96 S. Ct. 1817, 48 L. Ed. 2d 346 (1976).

For example, an ordinance or regulation aimed at the secondary effects of speech is "content-neutral" so long as the justifications for it have nothing to do with content. *Renton* v. *Playtime Theatres, Inc.*, supra, 49; accord *Boos* v. *Barry*, supra, 320. In contrast, the United States Supreme Court has concluded that "[r]egulations that focus on the direct impact of speech on its audience present a different situation. Listeners' reactions to speech are not the type of 'secondary effects' we referred to in *Renton*." *Boos* v. *Barry*, supra, 321; *Forsyth County* v. *Nationalist Movement*, 505 U.S. 123, 134, 112 S. Ct. 2395, 120 L. Ed. 2d 101 (1992).

In this case, one of the factors that the defendants considered in determining whether to invoke § 7-284 was the content of 2 Live Crew's music.[1] On May 9, 1994, the defendants filed an amended answer to the plaintiff's request for admissions, in which the defendants admitted that "[t]he decision to assign police at the Palace Cafe's 2 Live Crew concert *took into account the nature of the music and the content of the lyrics*, insofar as the nature or content might provoke or incite the crowd and thereby cause public safety concerns." (Emphasis added.) Furthermore, Bernard Sullivan, the commissioner of public safety at the time of this event, testified during a deposition that one of the factors that he considered in determining "[w]hen police protection is necessary or required" pursuant to the statute was the behavior of the audience. He stated that he considered "[t]he type of behavior, known behavior. . . . [D]ifferent crowds follow different groups' types of music and stuff, and you get different behavioral issues out of them that are taken into consideration." Additionally, Peter Plante, the commanding officer of the Troop C

---

[1] Although I agree with the majority that the defendants considered many content-neutral factors in determining whether to invoke § 7-284, the record reveals that they also considered content-based factors, which the majority agrees is impermissible.

barracks of the Connecticut State Police in Stafford Springs at the time of the concert, stated in his deposition that, on the day of the concert, he discussed with his staff the nature of 2 Live Crew's music and that the "discussion about the nature of the music had to do with the effect that the music might have on the crowd . . . ." The trial court, in fact, in rendering summary judgment in favor of the plaintiff, concluded that "[t]he evidence submitted by the parties in this case clearly establishes that the defendants, in reaching their decision, considered 'intelligence' information, which included material from Florida, Rhode Island, and Texas regarding 2 Live Crew concerts there and audience reactions to those concerts. . . . In invoking § 7-284, the defendants based their decision on the direct impact of speech and the listeners' reactions to speech."[2]

This case is not unlike *Forsyth County* v. *Nationalist Movement*, supra, 505 U.S. 123, in which the United States Supreme Court concluded that an ordinance that allowed the county administrator to charge a fee for the issuance of a permit to hold a parade or assembly was impermissibly content-based. The administrator was empowered to adjust the amount of the fee in order to meet the expenses arising from the administration of the ordinance and the maintenance of the public order during the event for which the permit was sought. Id., 126–27. The constitutionality of this ordinance was challenged by the Nationalist Movement when it was charged $100 for a permit to conduct a demonstration

---

[2] For example, an investigative report prepared by the chief of police of the Westerly, Rhode Island police department noted that various cities had decided to require police protection at 2 Live Crew concerts because the group had achieved great notoriety and increased interest by fans and the media following a 1990 decision by a United States District Court that the songs from the group's "As Nasty As They Wanna Be" album were obscene, and the subsequent arrest of two of the group's members for nonetheless performing songs from this album.

816

in opposition to the federal holiday commemorating the birthday of Martin Luther King, Jr. Id., 127.

The court first concluded that the ordinance left unbridled discretion to the administrator.[3] "The decision how much to charge for police protection or administrative time—or even whether to charge at all—is left to the whim of the administrator. There are no articulated standards either in the ordinance or in the county's established practice. The administrator is not required to rely on any objective factors. He need not provide any explanation for his decision, and that decision is unreviewable. Nothing in the law or its application prevents the official from encouraging some views and discouraging others through the arbitrary application of fees. The First Amendment prohibits the vesting of such unbridled discretion in a government official."[4] Id., 133. The application of § 7-284 to the case presently before us was similarly discretionary. Sullivan testified that there were no standards pursuant to the statute as to whether to bill, whom to bill and how much to bill. He had the discretion to decide whether to charge a fee for various events and "there were times when we did things for charities and things like that, where we allowed officers to donate their time, and we would have the protection there. And if an officer donated his time to a charity, we certainly wouldn't have billed them. . . . The decision-making process, whether to

[3] The United States Supreme Court also disapproved of the ordinance because by "requiring a permit and a fee before authorizing public speaking, parades, or assemblies . . . [it was] a prior restraint on speech." *Forsyth County* v. *Nationalist Movement*, supra, 505 U.S. 130.

[4] The administrator testified that he had charged various fees for permits for different events, without providing any basis for the differences. For example, the Nationalist Movement had been charged $100 on a prior occasion, while bicycle race organizers had been charged $25 to hold a race on county roads and the Girl Scouts had been charged $5 for an activity on county property. Further, in certain cases, the county required neither a permit nor a fee for activities on county facilities or land. *Forsyth County* v. *Nationalist Movement*, supra, 505 U.S. 132.

bill or not, normally would only be if it was a charitable event or if the city itself was sponsoring an event. If it was an event sponsored by a private promoter, it was not for charity, strictly a for-profit event, we would always impose the statute, that they would have to pay for police protection if it was needed." Sullivan further testified that even with for-profit events, he would sometimes charge a reduced rate.[5]

The court in *Forsyth County* further concluded that the "ordinance contains more than the possibility of censorship through uncontrolled discretion. As construed by the county, the ordinance often requires that the fee be based on the content of the speech. . . . In order to assess accurately the cost of security for parade participants, the administrator must necessarily examine the content of the message that is conveyed . . . estimate the response of others to that content, and judge the number of police necessary to meet that response. The fee assessed will depend on the administrator's measure of the amount of hostility likely to be created by the speech based on its content. . . . It is clear . . . that, in this case, it cannot be said that the fee's justification ha[s] nothing to do with content." (Citations omitted; internal quotation marks omitted.) Id., 133–34. Rather, the cost of policing the demonstration is "associated with the public's reaction to the speech." Id., 134. This is directly applicable to the case presently before us because, in determining whether police protection was necessary or required for this concert and the quantity that would be necessary or required, the defendants stated that they considered

[5] These examples of Sullivan's arbitrary application of § 7-284 stem from his tenure as the police chief of the city of Hartford. Although he testified during his deposition that the first time that he applied § 7-284 in his capacity as commissioner of public safety was in the case presently before us, he further testified, however, that he applied the statute in the same manner as commissioner as he had previously applied the statute while he was chief of police.

the content of the message and the response of the audience to that content. Therefore, the defendants' invocation of § 7-284 was not " 'justified without reference to the content of the regulated speech' "; *Renton* v. *Playtime Theatres, Inc.*, supra, 475 U.S. 48; rather, it was justified with reference to its content and the listeners' reactions to the speech. This is unconstitutional. See *Forsyth County* v. *Nationalist Movement*, supra, 505 U.S. 134.

The majority incorrectly determines that the application of § 7-284 in this case was content-neutral and, consequently, incorrectly concludes that its application constituted a "valid time, place, or manner restriction." It disposes of the critical admission in which the defendants stated that they considered the content of 2 Live Crew's lyrics in determining whether to apply § 7-284 by reasoning that Sullivan had considered only "whether the content of the music *'might* provoke or incite the crowd' "; (emphasis in original); and not that the music *would in fact* provoke or incite the crowd. The majority states that "[t]here is no evidence in this record . . . that Sullivan found that the music *would* incite the crowd or that the determination of the number of police necessary to ensure the public safety was actually affected by any message conveyed by the music." (Emphasis in original.) I discern no difference, however, between considering whether the content of music might or would incite lawlessness. It is sufficient that the defendants considered the content of the music in making their decision. It is irrelevant that there is no evidence that lawlessness would actually ensue. See *Texas* v. *Johnson*, 491 U.S. 397, 409, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989) (impermissible to consider even whether speech has potential to be breach of peace). In fact, if the defendants had proven that 2 Live Crew's music had been "directed to inciting or producing lawless action and [was] likely to incite or produce such

action"; *Brandenburg* v. *Ohio*, 395 U.S. 444, 447, 89 S. Ct. 1827, 23 L. Ed. 2d 430 (1969); their application of § 7-284 to the concert would have been permitted. Id. Because I agree with the majority that there is no evidence in the record, however, that the concert was "directed to inciting or producing imminent lawless action," the majority could not rely on this exception. All we are left with, then, is the application of § 7-284 based on the audience's reaction to the content of 2 Live Crew's music—an application that is clearly unconstitutional.

By considering the content of 2 Live Crew's music in determining whether to apply § 7-284, the defendants can, consequently, "grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." (Internal quotation marks omitted.) *Renton* v. *Playtime Theatres, Inc.*, supra, 475 U.S. 48–49. This is not permitted by the first amendment. Accordingly, I respectfully dissent.[6]

---

[6] Because I conclude that the application of § 7-284 to the 2 Live Crew concert at issue in this case was content-based, I disagree that the test used in part II B and C of the majority opinion properly may be applied. Instead, the proper test for a content-based statute requires that we ask whether it is "necessary to serve a compelling state interest and . . . is narrowly drawn to achieve that end." (Internal quotation marks omitted.) *Boos* v. *Barry*, supra, 485 U.S. 321. The trial court determined that this test was not satisfied because, although a compelling state interest was involved—public safety—the statute was not narrowly drawn because it left too much discretion in its application. The defendants, believing that the statute was applied in a content-neutral manner in this case, do not claim that this stricter test was satisfied.

Furthermore, I agree with part III of the majority opinion that § 7-284 can be applied in a content-neutral manner in the future as long as its application is justified without reference to either the content of the speech or the listeners' reaction to the speech.