[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION 
This case is a contest between two natural gas utilities over the right to service a residential development in southern Berlin, Connecticut under the Special Acts governing this regulated industry. At its core it raises the question of whether the franchisee plaintiff Connecticut Natural Gas Corporation (CNG) has consented to, or lost its right to oppose, defendant Yankee Gas Services Company's (Yankee) invasion of its territory.
CNG's amended complaint sounds in three counts, alleging on the part of Yankee the violation of CNG's franchise rights in Berlin, tortious interference with business expectations and a violation of the Connecticut Unfair Trade Practices Act (CUTPA), all in connection with Yankee's providing natural gas to a subdivision named Silver Ridge. It seeks injunctive relief precluding Yankee from servicing the subdivision, monetary damages and, under CUTPA, both punitive damages and attorney's fees. Yankee's answer raises as affirmative defenses laches, equitable estoppel and waiver.
During the pendency of this suit, the parties agreed that Yankee could complete certain pipelines necessary to service a limited number of houses in the subdivision including a model home, with the understanding that CNG could recapture those facilities if it prevailed in this action and that the installation would not prejudice CNG's rights in this action.[1] The parties also agreed that the court should sever at trial the issues of any punitive damages or attorneys fees under the CUTPA count and just compensation for facilities installed by Yankee if a permanent injunction issues, and defer those for subsequent proceedings.
The matter was tried to the court in two days, with 12 witnesses, plaintiff's 53 exhibits, defendant's 34 exhibits and a lengthy stipulation of certain basic facts. Counsel subsequently filed proposed findings of fact, briefs and replies thereto and made oral argument.[2]
 CNG'S FRANCHISE 
CT Page 12191
CNG is a Connecticut corporation specially chartered by the Connecticut General Assembly with its principal place of business in Hartford, Connecticut. CNG was formed as a result of the merger of The New Britain Gas Light Company ("New Britain") into The Hartford Gas Company, effective August 31, 1968. As part of that merger, CNG acquired all of the special rights, powers and franchises possessed by New Britain.
By Special Act, New Britain was "authorized to do any and all acts and exercise any and all rights, franchises, and privileges within the limits of the towns of Berlin and Newington which, by its original act of incorporation and the amendments thereto, it is authorized to do and exercise within the limits of the city and town of New Britain . . ." 14 Spec. Acts 566, No. 60 (1905). New Britain was authorized and empowered to, among other things, "laydown. . . gas pipes . . . in the streets, alleys, avenues, or public grounds of the said borough of New Britain . . ." Act Incorporating the New Britain Gas Light Company, § 2 (1855).
 YANKEE'S FRANCHISE 
Yankee is a Connecticut corporation specially chartered by the Connecticut General Assembly with its principal place of business in Meriden, Connecticut. On or about May 26, 1989, an entity known as The Mohawk Gas Company (Mohawk) amended its Certificate of Incorporation to change its name to Yankee Gas Services Company. The Mohawk Gas Company was chartered in 1955 by Special Act of the Connecticut General Assembly. 27 Spec. Acts 166, No. 218 (1955). Section 2(b) of that Special Act provided that Mohawk was vested with the power "to . . . sell . . . natural, manufactured and mixed gas and the by-products thereof; provided, within the franchise area of any person, firm, corporation or municipality which is chartered or authorized by the state of Connecticut to transmit or sell gas within said franchise area, this corporation shall not exercise the authority granted by this section to sell natural, manufactured or mixed gas to any person, firm, corporation or municipality except a person, firm, corporation or municipality authorized to transmit or sell gas within such franchise area, unless such sale is consented to by such person, firm, corporation or municipality so authorized to transmit or sell gas within such franchise area." (Emphasis added.) Section 2(d) provided that Mohawk was "vested with the power" "to acquire . . . and to hold, own, use, exercise, enjoy and dispose of the whole or any part of the gas CT Page 12192 property, rights, privileges, properties, securities, contracts, powers and franchises now or hereafter owned or possessed by any gas company chartered by the general assembly of the state of Connecticut for the purchase, manufacture, production, transmission, distribution and sale of natural, manufactured and mixed gas and matters incidental thereto."
By an "Assignment of Gas Franchises and Agreement" dated June 30, 1989, The Connecticut Light and Power Company ("CLP") transferred and assigned unto Yankee "those rights, privileges, authorizations and franchises to conduct a gas utility business granted to CLP in Section 1 of an Act Amending the Charter of The Connecticut Light and Power Company contained in Conn. Spec. Acts, 1927, Vol. XX, p. 223, . . . those rights, privileges, authorizations and franchises to conduct a gas utility business within the State of Connecticut granted in Section 1 of an Act Incorporating The Connecticut Gas Company contained in Conn. Spec. Acts, 1945, Vol. XXIV, p. 735, which rights, privileges, authorizations and franchises were transferred to CLP on the merger into CLP of The Connecticut Gas Company in 1982, . . . those rights, privileges, authorizations and franchises to conduct a gas utility business within the State of Connecticut granted in Sections 1 and 3 of an Act Amending the Charter of The Connecticut Gas Company contained in Conn. Spec. Acts, 1951, Vol. XXVI, p. 315, which rights, privileges, authorizations and franchises were transferred to CLP on the merger into CLP of The Connecticut Gas Company in 1982."
The Act Amending the Charter of The Connecticut Light and Power Company states in relevant part that "The Connecticut Light and Power Company is authorized to manufacture, purchase, supply and/or distribute gas within the state of Connecticut . . . and to manufacture and sell the by-products thereof, excepting that it shall not have power to supply and sell gas within the territory occupied and served by any other company now incorporated unless by consent of such other company . . ." (Emphasis added.) 20 Spec. Acts 223, No. 195 (1927).
The Act Incorporating The Connecticut Gas Company authorized The Connecticut Gas Company "to acquire by lease, purchase or otherwise, upon such terms and conditions as may be agreed upon, and to hold, own, use, exercise, enjoy and dispose of the whole or any part of the gas property, rights, securities and franchises of any corporation authorized to manufacture, sell or dispose of gas in any town in the state of Connecticut . . ." 24 CT Page 12193 Spec. Acts 735, No. 340 (1945). The Act Amending the Charter of the Connecticut Gas Company authorized The Connecticut Gas Company "to buy, manufacture, produce, sell, furnish, transport, store, distribute, dispose of and otherwise deal in natural, manufactured and mixed gas and the by-products thereof; provided, that within the franchise area of any person, firm, corporation or municipality which is chartered or authorized by the state of Connecticut to transmit or sell gas within said franchise area, this corporation shall not exercise the authority granted by this section to sell natural, manufactured or mixed gas to any person, firm, corporation or municipality except a person, firm, corporation or municipality authorized to transmit or sell gas within such franchise area, unless such sale is consented to by such person, firm, corporation or municipality so authorized to transmit or sell gas within such franchise area." (Emphasis added.) 26 Spec. Acts 315, No. 464 (1951).
 HISTORY OF GAS SERVICE IN BERLIN 
Starting in 1927, The Connecticut Gas Company (Connecticut Gas) ran a line from the Koppers Coke Company manufactured gas plant in New Haven to the north, passing through Berlin. Starting in at least 1928, New Britain, and later CNG, served customers beyond its own distribution system by tapping into mains owned by Connecticut Gas, and later CLP, in Berlin. This was done pursuant to a series of agreements. Under the agreements, Connecticut Gas or CLP sold gas to CNG for CNG to sell to its customers.
New Britain, and later CNG, expanded its distribution system in Berlin. As part of its expansion, New Britain, and later CNG, purchased existing sections of main from The Connecticut Gas Company and later CLP. In 1959, The Connecticut Gas Company sold to CNG's predecessor, New Britain, its mains north of the intersection of Porter's Pass, and what was then Seymour Road in the Town of Berlin. By Bill of Sale dated October 20, 1972, The Connecticut Gas Company sold to CNG its mains along Lower Lane north of the intersection of Meadow Lane and its mains on Porter's Pass from what was then Seymour Road to Farmington Avenue, and its mains on Farmington Avenue from Porter's Pass to Lincoln Street. By Bill of Sale dated January 31, 1983, CLP sold to CNG its main along Spruce Brook Road from the Berlin Turnpike to Main Street in Berlin.
Beginning in the middle of 1981, there was at least one CT Page 12194 meeting, and several items of correspondence were exchanged between CNG and CLP, in an attempt to resolve existing territorial disputes with regard to a number of towns. On July 13, 1981, The Connecticut Gas Company sent a Notice of Termination of the April 1, 1968 Agreement for sales of gas by The Connecticut Gas Company to CNG for resale to its customers. The effective date of termination was to be August 1, 1982.
Just prior to that expiration date, on July 8, 1982, Philip T. Ashton, Senior Vice President and General Manager of The Gas Group at Northeast Utilities wrote to CNG, and informed CNG that it could continue to serve preexisting Berlin customers from CLP facilities; Ashton also wrote: "[H]owever, any future requests for gas service from CLP facilities will be treated as CLP customers until such time that CNG extends its own facilities in these areas." When CNG received the July 8, 1982 letter from CLP, it generated discussions at the officer level involving franchise rights. The understanding after this letter was written was that to the extent CLP, and later Yankee, picked up any customers in Berlin, CNG could recapture those customers once it extended its mains into the area.
Commencing in September of 1984, CLP, and later Yankee, began to install service laterals and meters for any Berlin resident who requested service from CLP gas facilities in areas of Berlin where CNG had not yet extended its facilities. With the exceptions of the first 1984 customer and The Worthington Point subdivision customers, CLP and Yankee did not ask for CNG's consent to serve individual customers in Berlin.
In 1985, CLP entered into a written agreement with CNG, whereby CNG temporarily assigned its right to distribute and sell natural gas to one single-family and eight two-family dwellings located on Worthington Point Drive and Lake Drive in Berlin. CNG expressly reserved the right to "recapture" these customers if it ever extended its main to that subdivision.
When CLP assigned its franchise rights to Yankee as of July 1, 1989, Berlin was not listed as a town served with gas by CLP. But from September 1984 to the present, CLP or Yankee has supplied and sold gas to residential and commercial customers within the Town of Berlin.
The Senior Vice President of CNG in charge of Gas Supply, Marketing and Sales from 1989 to 1996, knew that Yankee was CT Page 12195 acquiring new customers in the Town of Berlin. In 1989 Yankee began negotiations with the Lewis Boyle Corp. at 2500 Wilbur Cross Highway to bring gas service to that facility. Yankee extended its mains 600 feet in order to reach the Lewis Boyle facility in Berlin near the town border. Yankee began supplying gas to the Lewis Boyle Corp on August 21, 1990.
In October of 1991, Yankee first began to undertake to provide gas service to The Hawthorne Inn at 2421 Wilbur Cross Highway in Berlin. At the time that Yankee was negotiating to bring gas service to the Hawthorne Inn, CNG was aware that Yankee was seeking to do so. Yankee laid fifteen hundred feet of main in the Wilbur Cross Highway to service the Hawthorne Inn. Yankee commenced supplying gas to the Hawthorne Inn in April, 1993. The main laid to service the Hawthorne was a new main installed specifically to service the Hawthorne Inn.
On November 1, 1995, CNG and Yankee entered into an agreement that permits CNG to serve customers in Berlin off of Yankee's mains and the converse in South Windsor. In 1996, pursuant to the agreement's terms, CNG contacted Yankee regarding running a service line to a customer at 355 Reservoir Road off of a Yankee main. CNG installed that service line without objection.
Yankee now has approximately 38 customer meters in Berlin, excluding Silver Ridge. As of the filing of its 1996 DPUC report, CNG had an extensive distribution system in Berlin with over eighty miles of pipeline and approximately 3,924 customer meters, thirty-three of which CNG served from Yankee's mains in Berlin.
 CNG'S RATE STRUCTURE 
CNG is regulated by the Connecticut Department of Public Utility Control ("DPUC"), which establishes the rates CNG can charge for the sale of gas and the transportation of gas through its pipes to the customer at retail. CNG does not have the flexibility to change those rates for individual customers. When a prospective customer seeks gas service, CNG must determine if it can provide that gas service at the rates set by DPUC and achieve CNG's hurdle rate.
The hurdle rate is the cost to CNG of obtaining the capital necessary to provide that service. The analysis of whether CNG will make its hurdle rate depends on the cost of capital and the projected revenue from the prospective customer. During the CT Page 12196 Summer of 1997, CNG's hurdle rate was 7.96 percent. If CNG cannot make its hurdle rate for a particular customer, it can ask for contribution in aid of construction from the customer to help defray the costs of extending service to that customer. If contribution in aid of construction is necessary to serve a prospective customer, and the prospective customer is unable or unwilling to make that payment, CNG generally will not serve that customer, even if that customer is within CNG's franchise territory.
If CNG served customers without attaining CNG's hurdle rate, it would risk a disallowance of that capital investment by DPUC. If a utility does not make its hurdle rate for a particular customer, that deficiency must be made up by the other customers. This imposes on those other customers a burden that DPUC seeks to prevent.
CNG could not meet its hurdle rate to serve the individual customers that CLP and later Yankee began to serve in Berlin starting in September 1984. For example, before Yankee began service to The Hawthorne Inn, CNG analyzed whether it could serve The Hawthorne Inn and determined that it needed a significant contribution in aid of construction. The Hawthorne Inn refused to pay that contribution.
 SILVER RIDGE 
In the beginning of 1997, Laudon Associates began construction on Silver Ridge, a residential development in the southern part of the Town of Berlin located off of the Wilbur Cross Highway. Silver Ridge is to consist of 119 free-standing residences.
On or about February 11, 1997, Carl Gandolfini, a Commercial Sales Specialist with CNG, contacted Donald Klepacki, the developer's project manager for Silver Ridge. Klepacki indicated that he wanted natural gas and provided Gandolfini with information regarding the project, including a site plan. CNG determined that it could extend its mains to the Silver Ridge subdivision and make its hurdle rate, without requiring contribution from the customer.
In late February 1997, Richard Witte, a salesperson for Yankee, contacted Klepacki and expressed Yankee's interest in servicing Silver Ridge. On March 26, 1997, Klepacki informed CT Page 12197 Witte that CNG also was interested in serving Silver Ridge. Donald Klepacki told Richard Witte, "I want the best deal, I would go with whoever offered the best deal."
In late April 1997, Witte submitted a contract from Yankee for Klepacki's review. That contract did not include any incentives. Klepacki did not sign it, and told Witte that he was waiting for CNG's proposal. A few days later, on May 2, 1997, Yankee enhanced its offer with an incentive package of rebates.
Later in May 1997, Gandolfini of CNG informed Klepacki that CNG could extend its mains and provide service at no cost. Klepacki told Gandolfini that Yankee also had made an offer to provide gas service to Silver Ridge, which included certain rebate incentives.
CNG elected to compete with Yankee to try to get a contract to serve the Silver Ridge project. Gandolfini met with his supervisor, Scott Conover, who in turn met with corporate counsel to discuss how to respond to Yankee's offer. CNG decided that Yankee's actions could be addressed more efficiently in the marketplace than in a courtroom.
Thereafter, in June 1997, Gandolfini conveyed to Klepacki CNG's offer of certain rebate incentives. Gandolfini memorialized CNG's rebate offer in a letter, dated June 11, 1997, and arranged to meet Klepacki to sign the final contract.
During the second week of June 1997, Klepacki called Witte of Yankee and informed him of CNG's terms. Klepacki never told Witte that he was committed to CNG. Witte informed his supervisors of CNG's contract terms and asked for their approval to offer an enhanced incentive package from Yankee. As part of that presentation to his supervisors, Witte prepared notes that indicated that if CNG successfully solicited Silver Ridge, it could recapture The Hawthorne Inn as well.
After Witte's presentation, Yankee's management approved an additional incentive, a $30,000 lump sum payment made directly to the developer of Silver Ridge upon the first home hookup. Yankee then made its new rebate offer three days later. Klepacki signed a contract that memorialized the terms of Yankee's third offer on June 24, 1997.
It is clear that Laudon Associates contracted with Yankee CT Page 12198 because it got a better proposal from Yankee than it received from CNG. Upon learning of the contract between Laudon Associates and Yankee, CNG's corporate counsel protested by letter to his counterpart at Yankee on June 26, 1997. On July 29, 1997, CNG filed this suit for injunctive relief.
Yankee did not misrepresent any fact to Klepacki or deceive or disparage CNG to him, in order to get Klepacki to sign with Yankee. But at no time did Yankee seek consent from CNG to serve Silver Ridge.
Yankee has excavated under certain streets of Silver Ridge, installed pipe and initiated gas service to a model home. Yankee intends to sell gas directly to the future residents of Silver Ridge. The service to the Silver Ridge subdivision will be tapped off the existing main that services the Hawthorne Inn.
Without the Silver Ridge subdivision, CNG did not currently intend to extend its mains in that area of Berlin. But the potential extension of CNG's mains to Silver Ridge provides CNG with the following economic opportunities: service to the 119 future residences in Silver Ridge, service to The Hawthorne Inn, and possible service to future development along that extension. CNG was and remains prepared to extend its facilities to serve Silver Ridge.
THE CRITERIA FOR A PERMANENT INJUNCTION INVOLVING FRANCHISE RIGHTS 
Our Supreme Court has often held that the issuance of an injunction rests in the sound discretion of the trial court.O'Neill v. Carolina Freight Carriers Corporation, 156 Conn. 613,618, 244 A.2d 372 (1968); Taylor v. Conti, 149 Conn. 174, 181,177 A.2d 670 (1962); Adams v. Greenwich Water Co., 138 Conn. 205,83 A.2d 177 (1951). It is axiomatic that "[a] party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law." (Internal quotation marks omitted) Berin v. Olson, 183 Conn. 337,340, 439 A.2d 357 (1981).
"[W]hether damages are to be viewed by a court of equity as `irreparable' or not depends more upon the nature of the right which is injuriously affected than upon the pecuniary loss suffered." (Internal quotation marks omitted)". Berin v. Olson,supra, 183 Conn. 341. In the context of franchise rights, CT Page 12199 Connecticut courts traditionally have maintained the General Assembly's franchise scheme and have enjoined their invasion.Board of Public Utilities Commissioners v. Yankee Gas ServiceCo., 236 Conn. 787, 672 A.2d 953 (1996); New England R.R. Co. v.Central Ry. Electric Co.. et al, 69 Conn. 47, 36 A. 1061 (1897);Fitch v. N. Haven, N. London Stonington R.R. Co, 30 Conn. 38
(1861); The Enfield Toll Bridge Co. v. The Hartford New HavenR.R. Co., 17 Conn. 40 (1845). "The grant of a nonexclusive franchise does not carry with it the right to be free from competition from another entity that has been granted a valid franchise. It does, however, embody a right to be free from unauthorized competition, and if a party enters a franchisee's territory without such authorization, an injunction is a proper remedy." Groton v. Yankee Gas Services Co., 224 Conn. 675,685-86, 620 A.2d 771 (1993).
Nor does the possibility of an injured franchisee repeatedly seeking monetary damages for any ongoing unauthorized invasion of its territory mean that it has an adequate remedy at law. "While it is correct that the plaintiff would have an action at law for damages for any further injury from the defendants, that hardly prevents equitable relief in this case for at least two reasons. Firstly, as we have said, "[t]he prevention of a multiplicity of actions at law is one of the special grounds of equitable jurisdiction, and for that purpose the remedy by injunction is freely used, and that, too, although there may be a legal remedy." Hammerberg v. Leinert, 132 Conn. 596, 602, 46 A.2d 420
(1946). Secondly, the circumstance that the injury or the potential for injury is of a continuing nature permits the intervention of equity." (Citations omitted.) Berin v. Olson,supra, 183 Conn. 342-53.
The question before the court is whether Yankee has made an unauthorized incursion into Berlin when it entered into a contract to supply natural gas to the future residents of Silver Ridge and placed gas lines under the streets. If it has, given the ongoing nature of that contract and service, given Yankee's limited involvement with that development and given CNG's undisputed territorial rights in Berlin, then an injunction against Yankee should issue. Determining if Yankee's supply of gas to Silver Ridge is unauthorized requires the court to answer the question at the heart of this case. Did CNG consent to Yankee selling gas to Silver Ridge by its actions or silence?
 THE ISSUE OF CONSENT 
CT Page 12200
The significance of any consent by CNG to Yankee's sale to Silver Ridge lies in the language of Yankee's and CNG's special acts which define their franchises. "A franchise is a particular privilege conferred by grant from the government on an individual or group of individuals that does not belong to the citizens generally of common right." Groton v. Yankee Gas Services Co.,supra, 224 Conn. 682.
CNG, under its special act charter of 1905, has a non-exclusive franchise to supply and sell gas in Berlin. Yankee, under the special acts which give it authority (originally the charters of Mohawk, CLP and Connecticut Gas) is not limited to a specific territory, but may operate statewide excepting within an existing franchisee's territory. It is clear that Berlin is a territory and that CNG occupies and serves that territory. Under each of its special act sources, Yankee needs the consent of the existing franchisee to operate within such a territory.
Yankee's charter (27 Spec. Acts 166, No. 218 (1955)) was given it under its original name of Mohawk. Section 2(b) of that act requires it to obtain an existing franchise holder's consent to each retail sale within that holder's territory.[3] The operative language under 2(b) is "unless such sale is consented to by such, . . . corporation . . . authorized to . . . sell gas within such franchise area".
Yankee's charter section 2(d) allows it to acquire and utilize the powers and franchises of other chartered gas companies, even if such differ from Yankee's powers under section 2(b). Groton v. Yankee Gas Services Co., supra, 224 Conn. 609. The Connecticut Gas charter acquired by Yankee under section 2 (d) has limiting language identical to that of section 2(b). The CLP charter acquired by Yankee under section 2(d) has slightly different language. It provides, in relevant part, that Yankee needs the consent of a company occupying and serving a territory to "have the power to supply and sell gas" there.[4]
The construction of "consent" in the context of a special act should be based upon its "commonly approved usage." General Statute § 1-1(a). "Consent" is defined as "to give assent: Agree." Webster's II New College Dictionary P. 240 (1995). "Consent" means willingness in fact that an act or invasion of an interest shall take place. 1 Restatement (Second), Torts, § 10A (4th Ed. 1989). It is a "capable, deliberate and voluntary CT Page 12201 agreement to or concurrence in some act or purpose implying physical and mental power and free acting . . . It is the voluntary acceptance or allowance of what is planned by another." (Citations omitted; internal quotation marks omitted.) State v.Tirado, 21 Conn. App. 449, 458, 586 A.2d 625 (1990).
Of course, case law provides that "consent" or "assent" may be inferred from the attendant circumstances and conduct of the parties. Seal Audio, Inc. v. Bozak, Inc., 199 Conn. 496, 517,508 A.2d 415 (1986); Rowe v. Cormier, 189 Conn. 371, 373,456 A.2d 277 (1983); Yale Co-Operative Corp. v. Rogin, 133 Conn. 563, 568,53 A.2d 323 (1947); See, generally 1 Am.Jur.2d, Actions § 48 (1994). And the ancient maxim "silence gives consent" permits an inference that a party who is silent intends to consent, or assent, if there can be no other explanation for the party's silence. See State v. Martin, 38 Conn. App. 731, 742,663 A.2d 1078 (1995), cert. denied, 237 Conn. 921, 676 A.2d 1376 (1996).
It is Yankee's position, articulated at oral argument, that CNG has consented to the specific sale to Silver Ridge as required under the Mohawk charter and the Connecticut Gas charter. In essence, Yankee argues that CNG gave such consent by initially electing to compete for the Silver Ridge contract and deferring legal claims until after Silver Ridge selected Yankee over CNG. The court does not agree.
CNG was not requested by Yankee to consent to the proposed sale. CNG made no statements which constituted consent to this sale. And CNG's decision to defer legal action until after the selection process is not, viewed under all the circumstances then existing, conduct constituting assent to Yankee's conduct. Deferring legal action for a few weeks, until it becomes obvious whether business realities have or have not eliminated the need for the private expense and public cost inherent in commercial litigation, constitutes neither a silence without any explanation, nor a voluntary acceptance of a sale that CNG was simultaneously opposing in the field.
It is also Yankee's position that it already jointly occupies and serves Berlin with CNG, and therefore, the consent requirement of Yankee's 1927 charter (originally CLP's) is inapplicable. The record does not support this claim. It does not support the claim that Yankee or its predecessor was already occupying and serving Berlin at the time of the 1927 special act. CT Page 12202 The first record of either Yankee or its predecessors serving a customer in Berlin, other than selling to franchisee CNG for resale, is in 1984.
Nor does the language of the 1927 charter support a claim that Yankee can avoid the need for consent by beginning sales in Berlin after that year. The clear language of the 1927 special act indicates that Yankee "shall not have the power to supply and sell gas within the territory occupied and served by any other company now incorporated unless by consent of such othercompany . . ." (Emphasis added.) It is an untenable interpretation to suggest that Yankee could, by subsequently supplying and selling within an occupied territory, avoid the need for the very consent which the charter requires as a prerequisite to such operation.
Yankee also claims that CNG, by silence and inaction, has given the consent required by the 1927 act to Yankee having the power to sell gas within Berlin, including Silver Ridge. The history of CNG's (including predecessors) and Yankee's (including predecessors) dealings in Berlin simply do not show consent by CNG to Yankee having the "power to supply and sell gas within the territory occupied and served by" CNG, the town of Berlin.
CLP's special act, now Yankee's charter, must be strictly construed, and its authority limited to that explicitly granted. See, Groton v. Yankee Gas Services Co., supra, 224 Conn. 682. When statutory language is clear, that language is deemed to be the legislative intent, All Brand Importers, Inc. v. Dept. ofLiquor Control, 213 Conn. 184, 195, 567 A.2d 1156 (1989).
The 1927 special act, unlike the Mohawk or Connecticut Gas charters, by its terms requires more than a consent from CNG to a mere sale or sales by Yankee. It requires a consent by CNG as the existing franchisee to Yankee having the very power to sell and supply gas in Berlin to consumers. That power would be a power to compete on an equal basis with the franchisee CNG under Yankee's charter from CLP. There was no such consent by CNG, by word, conduct or inaction.
There is no question that CLP, and later Yankee, made sales within Berlin directly to new customers, beginning in 1984. But the court finds that such sales were made pursuant to an understanding between CLP, and later Yankee, and CNG, that such sales were to persist only until CNG could serve those new CT Page 12203 customers by its own lines. At that time, the customers would switch to CNG. That understanding was set forth in a letter from CLP of July, 1982, and both recognized and followed by both parties.
The parties working agreement is a recognition of CNG's superior right to serve Berlin consumers. If CNG were consenting to Yankee having the power to supply and sell in Berlin, CNG would have no recapture right in Yankee's Berlin customers, for Yankee would have full and equal rights to Berlin under its charter from CLP.
The Worthington agreement of 1985 is further evidence that no such consent was intended. If CLP had acquired the consent of CNG to a power of CLP to serve Berlin under the 1982 agreement and the 1984 sale, CLP would not have needed an assignment from CNG of the latter's franchisee rights to sell gas to nine homes in Berlin. It furnishes further evidence that neither of the initial parties to the 1982 understanding viewed it as a consent to CLP obtaining the unqualified power to supply and sell in Berlin. The 1995 Yankee and CNG reciprocal agreement which restored the historical practice of allowing CNG to tap off of Yankee's mains to serve new Berlin customers, is further evidence of no such consent.
Under Yankee's interpretation of the facts and the CLP charter, a few sales with recapture rights constitutes a consent to unrestricted access to Berlin. The court finds that this was not the intent of CNG, nor did CNG assent to such.
The public policy implications of such a gloss upon the CLP charter are significant. It would provide a franchisee who occupies and serves less than all its territory with two alternatives. The franchisee either would have to refuse Yankee any opportunity to sell gas within its franchise territory or it would have to concede to Yankee unrestricted access to sell gas. Given the requirement that the franchisee meet the hurdle rate for any facilities expansion, this interpretation would force franchisees to forego letting Yankee serve consumers near Yankee territory (such as here) to the disservice of the public. The court does not adopt this position. It is inconsistent with the facts found here. Further, such a statutory construction would be unreasonable. Groton v. Yankee Gas Services Co., supra,224 Conn. 689. CT Page 12204
 THE SPECIAL DEFENSES 
Although Yankee pled equitable estoppel as a special defense, it did not brief same or raise it at oral argument. Accordingly, the court considers it abandoned. As to the special defenses of laches and waiver, the court finds that the defendant has failed to meet its burden of proof.
Waiver requires the intentional relinquishment of a right,Majernicek v. Hartford Casualty Ins. Co., 240 Conn. 86, 97,688 A.2d 1330 (1997), and may be implied from conduct and surrounding circumstances. Wadia Enterprises, Inc. v. Hirschfeld224 Conn. 240, 251, 618 A.2d 506 (1992). Yankee claims CNG waived the enforcement of its franchise rights by failing to assert them when CLP (and later Yankee) sold gas in Berlin subsequent to the 1982 letter and by bidding against Yankee for the Silver Ridge project.
As detailed previously above, the court finds the CLP/Yankee sales were made pursuant to an understanding between them and CNG, which provided for CNG to recapture the customers the former served when it became economical for CNG. It was not a consent to the former acquiring the power to sell and supply gas in Berlin. CNG has not been proven to have intentionally relinquished its superior rights, under its franchise, to serve Berlin gas customers. The court also finds that to the extent CLP/Yankee changed its position by extending gas mains and lines, it did so with the knowledge that it would lose those customers when CNG could meet its regulatory financial constraint of the hurdle rate and extend its mains to serve them.
Nor has the conduct of CNG, under all the circumstances, in bidding against Yankee for Silver Ridge been proven to be a waiver of CNG's franchise claims. Just as the brief delay in initiating the legal claims of CNG did not constitute consent, neither did it, for the same reasons, constitute an intentional relinquishment of CNG's franchise rights to Silver Ridge.
Yankee also claims laches should bar CNG's attempt to enforce its franchise rights in this 1997 suit. "We have continually held that "[l]aches consists of two elements. `First, there must have been a delay that was inexcusable, and, second, that delay must have prejudiced the defendant.' Kurzatkowski v. Kurzatkowski,142 Conn. 680, 685, 116 A.2d 906 (1955); Kievman v. Grevers,122 Conn. 406, 411, 189 A. 609 (1937); 27 Am.Jur.2d, Equity CT Page 12205 § 152. The mere lapse of time does not constitute laches; Finucanev. Hayden, 86 Idaho 199, 206, 384 P.2d 236 (1963); 27 Am.Jur.2d, Equity § 163; unless it results in prejudice to the defendant; see Leary v. Stylarama of New Haven, Inc.,174 Conn. 217, 219, 384 A.2d 377 (1978); Bianco v. Darien, 157 Conn. 548,556, 254 A.2d 898 (1969) . . . Bozzi v. Bozzi, 177 Conn. 232,239, 413 A.2d 834 (1979). Laches in legal significance is not mere delay, but delay that works a disadvantage to another. 1 Pomeroy, Equity Jurisprudence (5th Ed. Symonds) § 419d." (Internal quotation marks omitted.) Berin v. Olson, supra,183 Conn. 344.
Weighing all the circumstances, the court finds no inexcusable delay. The relatively brief delay of a few months between CNG's first notice that Yankee was seriously pursuing the Silver Ridge contract and the onset of legal proceedings is entirely excusable and reasonable for the reasons set forth in discussing this time period in the waiver and consent portions of this decision.
That period when Yankee sold gas in Berlin, prior to the Silver Ridge project, does not constitute a delay in CNG protecting its franchise rights. Those sales were pursuant to the parties 1982 understanding that CNG had recapture rights to any customers served by Yankee and did not constitute an acquiescence by CNG to franchise authority in Berlin for CLP/Yankee, as set forth earlier in this opinion. Finally, Yankee always knew that any investment in gas facilities to serve Berlin customers was subject to CNG's recapture rights. It is not now prejudiced by CNG's assertion of CNG's franchise right.
 JUDGMENT AS TO FIRST COUNT 
The court finds that plaintiff has sustained its burden of proof and proven that defendant is infringing on its franchise rights to the Silver Ridge project within the town of Berlin, that CNG will suffer irreparable harm, is without adequate remedy of law and that balancing the equities the court should exercise its discretion and grant the permanent injunctive relief requested. Accordingly, the court orders that defendant, and all persons acting under it's direction or control, are hereby enjoined from laying any pipeline to serve, and from providing natural gas services to any portion of, the development known as Silver Ridge in Berlin, Connecticut, and further, that defendant CT Page 12206 shall transfer all facilities installed by or for it pertaining to natural gas services in Silver Ridge to plaintiff. Because the court specifically deferred the issue of fair compensation for such transferred facilities at the time of trial, and in the interest of maintaining the flow of gas to any affected 3rd parties at Silver Ridge as winter approaches, counsel are ordered to consult and propose in writing to the court within one month both a date for the transfer of such facilities and an amount representing fair compensation.
 THE SECOND COUNT 
Connecticut has recognized for some time the tort of interference with business expectation. Sportsmen's BoatingCorporation v. Hensley, 192 Conn. 747, 754, 474 A.2d 780 (1984). Plaintiff is required to prove the existence of the expectation, defendant's intentional interference with it and a loss to the defendant's business. Solomon v. Aberman, 196 Conn. 359, 364,493 A.2d 193 (1985). Plaintiff must also prove the interference was by improper motive or means. Blake v. Levy, 191 Conn. 257, 262,464 A.2d 52 (1983). Intentional interference without justification is one method of improper motive or means. 4 Restatement (Second), Torts, § 766(s) (4th Ed. 1989).
Yankee interfered with CNG's franchise rights when it obtained the Silver Ridge contract without CNG's consent, knowing that CNG was seeking to service the project and that it was within CNG's franchise territory. CNG had a reasonable expectation it would supply gas service to Silver Ridge and lost business as a result of Yankee obtaining the contract. Further, Yankee undertook the interference without justification in light of its limited charter, CNG's territorial rights and the understanding between the parties found in the 1982 letter. That unjustified interference constitutes improper motive.
The fact that the court awarded injunctive relief does not preclude the plaintiff from receiving damages. Berin v. Olson,supra, 183 Conn. 342. But although CNG proved that it lost business opportunities, including Silver Ridge, as a result of Yankee's tortious interference, insufficient evidence was provided to allow the court to find the dollar amount of such loss. The court may not speculate or guess as to damages. Accordingly, judgment will enter for plaintiff on the Second Count with nominal damages of $1. CT Page 12207
 THE THIRD COUNT 
CNG's third count lies in CUTPA. The essence of its claim is that Yankee violated the CUTPA statute by providing gas under contract to Silver Ridge. While the steps to do so are several (contracting, laying pipe and furnishing gas), the violation is the single act of selling and supplying gas to this one project, Silver Ridge. CNG has not claimed that Yankee's sales to other Berlin customers since 1984, such as the Hawthorne Inn or Lewis Boyle Corp. are CUTPA violations or unfair acts or practices in the conduct of commerce. On the contrary, Yankee and before it, CLP undertook its prior acts pursuant to an understanding of the parties.
This raises the issue, which has frequently occupied the trial courts of this state, but has not yet been ruled upon at the appellate level, of whether a single act, if proven, can constitute a CUTPA violation under the language of the statutes.
"General Statutes § 42-110b (a) provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." General Statutes § 42-110b (a) makes reference to the plural "unfair methods of competition and unfair or deceptive acts or practices," and General Statutes § 42-110g (a) makes reference to the singular "method, act or practice." Due to this contradiction, there is a split of authority at the superior court level as to whether a single act can constitute a CUTPA violation.
Courts have held that an allegation of a single transaction is insufficient to bring a claim under CUTPA. See, e.g., Daltonv. Knell, 8 CSCR 1068 (September 13, 1993, Higgins, J.); Laks v.Metropolitan Property and Casualty Insurance Company,8 Conn. L. Rptr. 32 (December 3, 1992, Flynn, J.) (there is no cause of action under CUTPA based on a single act of misconduct by an insurer); Koehm v. Kuhn, 41 Conn. Sup. 130, 139, 558 A.2d 1042
(1989, Levine, J.), aff'd on other grounds, 18 Conn. App. 313,557 A.2d 933 (1989) ("[a], single instance or even isolated instances of unfair practices do not warrant actions under CUTPA."); Duncan v. Burnside Motors, Inc., 2 CSCR 379, 380
(February 26, 1987, O'Neill, J.) ("legislature was not considering an isolated event to allow civilian attorneys general' to act to correct some business vice.") CT Page 12208
Other courts hold that an allegation of a single transaction is sufficient to bring a claim under CUTPA. See, e.g., Levesquev. Kris Enterprises, 4 CONN. L. RPTR. 86 (May 20, 1991, Susco, J.); Metpath, Inc. v. IDS Corp. , 3 CONN. L. RPTR. 349 (March 12, 1991, Aronson, J.)." Spakowski v. Charter Oak Walk-In MedicalCtr., Superior Court, judicial district of New London at New London, Docket No. 528137 (June 2, 1994, Hurley, J.)
Of course the number of superior court cases on each side of the issue has grown considerably since 1994. But the basic issue remains. The court must reconcile the conflicting language of General Statutes §§ 42-110b (a) and 42-110g(a). In interpreting the statute, the court is guided by the general rules of statutory construction.
"In interpreting the language of a statute, we are guided by the premise that we must consider the statute as written and read it as a whole. Orticelli v. Powers, 197 Conn. 9, 13-14,495 A.2d 1023 (1985). [N]o part of a legislative enactment is to be treated as insignificant or unnecessary, and there is a presumption of purpose behind every sentence, clause or phrase . . . and no word in a statute is to be treated as superfluous. Insofar as it is possible, the entire enactment is to be harmonized, each part made operative." (Internal quotation marks omitted.) Groton v. Yankee Gas Services Co., supra,224 Conn. 689.
This court is of the opinion that in order to give purpose to the legislature's use of the plural terms in section 42-110b (a), more than one such unfair act by a defendant is required to be proven by plaintiff. CNG has failed to do so. Accordingly, judgment will enter for defendant upon the third count.
James T. Graham Superior Court Judge