[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This case is before the court on remand from the Supreme Court for an evidentiary hearing to determine:
1. whether the public parks where hunting is permissible are traditional public fora, nontraditional public fora or non-public fora; and
2. the nature and extent of the public interest served by General Statutes 53a-183a.[1]
CT Page 13436-c
For the purposes of clarity, the court will set forth the history of the case up to remand before proceeding with a discussion of the evidentiary hearing post remand. As the Supreme Court set forth in its decision, State v. Ball, 226 Conn. 265, 266-67, "[t]his case is a challenge to the constitutionality of the Connecticut Hunter Harassment Act. General Statutes 53a-183a. . . . In response to charges of having violated 53a-183a, the defendants, Catherine Ball, Arlene Corey, William Mannetti and Derek Oatis, filed motions to dismiss, alleging that the statute is unconstitutional, both facially and as applied to them, under the first and fourteenth amendments to the United States constitution. . . . The trial court denied the motions to dismiss. Reserving their rights to appeal their constitutional contentions, the defendants entered conditional pleas of nolo contendere pursuant to General Statutes 54-94a and Practice Book 4003. Each of the defendants was found guilty as charged and fined $100. The defendants thereafter appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book 4023 and General Statutes51-199 (c). We reverse the denial of the motions to dismiss and remand the case to the trial court for a further evidentiary hearing." (Footnotes omitted.) Id.
"On October 19, 1991, at 6:25 a.m., Robert Dubois, a bow hunter with a valid state archery license, was standing at the entrance to the Tunxis State Forest Wildlife Management Area in Hartland, waiting to enter the park. The area is state owned property subject to regulation by the department of environmental protection. On the day in question, a person with a valid archery license could legally engage in archery hunting in the state forest after 7 a.m." Id., 268.
"The defendants approached Dubois and told him that they were antihunting activists and that they would follow him into the park. A few minutes later, conservation officer McNamara arrived at the scene. Dubois complained to McNamara that the defendants were planning to harass him. McNamara warned the defendants that, if they interfered with Dubois' hunting, they would be subject to arrest. Dubois told the defendants that he planned to hunt deer from an old apple orchard and asked that he be left alone." Id.
"At about 7 a.m., Dubois entered the orchard, took a stand under a tree, and notched an arrow into his bow. The defendants formed a semicircle facing Dubois and tried to dissuade him from hunting. Dubois told them that they were interfering with his hunting and asked them to CT Page 13436-d get out of the line of fire. When the defendants did not move, Dubois asked McNamara to come to his assistance. McNamara explained to the defendants that their interference with Dubois' hunting was illegal and asked them to leave. After consulting among themselves, the defendants decided to be arrested rather than to comply with the request to leave the area. McNamara then arrested the defendants." Id.
The Supreme Court stated that the defendant's "first amendment challenge to 53a-183a is that the statute implicates free speech." Id., 270. The first issue before the court was "whether the trial court correctly ruled that the harassment and interference with hunting proscribed by the statute encompasses communicative as well as noncommunicative conduct." The Supreme Court agreed with this court and found that both communicative as well as noncommunicative conduct is encompassed by the statute thereby implicating the first amendment. Id., 272. The Supreme Court also upheld this court's finding that the statute is content-neutral on its face. Id., 275. The court now turns to the issues on remand.
 DISCUSSION
I. Type of Fora
Under United States Supreme Court precedent, "[t]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." Perry Ed. Assn. v. Perry Local Educators' Assn.,460 U.S. 37, 44, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). "In balancing the government's interest in limiting the use of its property against the interests of those who wish to use the property for expressive activity, the Court has identified three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum. Perry Ed. Assn. v. Perry Local Educators' Assn.,460 U.S. 37, 45-46 (1983). The proper First Amendment analysis differs depending on whether the area in question falls in one category rather than another." Airport Comm'rs v. Jews For Jesus, Inc., 482 U.S. 569,572-73, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987).
A. Traditional Public Fora
"In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the State to limit expressive activity are sharply circumscribed. At one end of the spectrum are streets and parks which "have immemorially been held in trust for the CT Page 13436-e use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' Hague v. CIO, 307 U.S. 496, 515 (1939). In these quintessential public forums, the government may not prohibit all communicative activity. For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. Carey v. Brown, 447 U.S. 455, 461 (1980). The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.United States Postal Service v. Council of Greenburgh Civic Assns.,453 U.S. 114, 132 (1981); Consolidated Edison Co. v. Public ServiceComm'n, 447 U.S. 530, 535-536 (1980); Grayned v. City of Rockford, [404 U.S. 104, 3115; Cantwell v. Connecticut, 310 U.S. 296 (1940);Schneider v. State, 308 U.S. 147 (1939)." Perry Ed. Assn. v. Perry LocalEducators' Assn., supra, 460 U.S. 45. To summarize, the court applies heightened scrutiny where a content-based statute is at issue and the under that level of scrutiny in a public forum the state "must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." Id. If a regulation is content-neutral mid-level scrutiny is applied and a state must show that the regulation is "narrowly tailored to serve a significant government interest, and leave[s] open ample alternative channels of communication." Id.
B. Nontraditional Public Fora
"A second category consists of public property which the State has opened for use by the public as a place for expressive activity. The Constitution forbids a State to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place. . . . Although a State is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum. Reasonable time, place, and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest. . . . (Citations omitted). PerryEd. Assn. v. Perry Local Educators' Assn., supra, 460 U.S. 45-6. Here again, in a nontraditional public setting, the scrutiny applied by the court in construing a statute is heightened if the statute is content-based and mid-level if the statute is content-neutral.
C. Non-public fora
CT Page 13436-f
"Public property which is not by tradition or designation a forum for public communication is governed by different standards. We have recognized that the First Amendment does not guarantee access to property simply because it is owned or controlled by the government. . . . In addition to time, place, and manner regulations, the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view. As we have stated on several occasions, the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated. . . . (Citations omitted; internal quotation marks omitted). Perry Ed. Assn. v. Perry LocalEducators' Assn., supra, 460 U.S. 45-6. To summarize, the scrutiny applied by the court in a non-public forum is the lowest level of scrutiny, rational review. Under this level of scrutiny a state may regulate speech on a content neutral basis if the regulation is supported by a reasonable government interest and the regulation is rationally related to the attainment of that interest.
In the case of State v. Linares, 232 Conn. 345, 655 A.2d 345 (1995), our State Supreme Court had the opportunity to apply the federal forum approach discussed above to the case that was before it. The court stated, "we recognize that the gallery of the Hall of the House in the capitol arguably may be classified as a public forum dedicated to specific uses by the public. This particular area fails to qualify as a traditional public forum because, unlike parks or streets, the gallery has not historically been devoted to public debate. . . . To conclude that it is a designated public forum would be to recognize the unique nature of the gallery and the narrow type of public involvement that traditionally occurs there. . . . This conclusion would also recognize the distinction between the specific qualities of the gallery, an area open only to public viewing and limited public expression, and the traditional nature of other areas in and around the capitol. . . . If we were to determine that the gallery of the capitol is such a designated public forum, we would then have to apply the most rigorous level of scrutiny and invalidate subdivisions [of the statute] as overbroad prohibitions unless they qualify as reasonable time, place and manner restrictions that are content neutral, narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication." (Citations omitted.) State v. Linares, supra,232 Conn. 369-71.
"Because the gallery has been opened to the public only for the limited CT Page 13436-g purpose of viewing and allowing minimal participation in the legislative process by moderate and timely expressions of approval or disapproval, however, it seems possible, under federal forum analysis. that this part of the capitol appropriately may be designated a nonpublic forum. . . . Similarly, locations other than the capitol that house official legislative proceedings, such as public hearings, may be considered to be nonpublic forums because the public likewise has only been given a limited expressive role in such places. The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse. If that were the case, we would uphold the statute as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." (Citations omitted; internal quotation marks omitted.) State v. Linares, supra, 232 Conn. 371.
In Linares, supra, however, the Supreme Court found that it was not necessary to "conclusively categorize the forum at issue" because the court concluded that the statute at issue was a "reasonable time, place and manner restriction and . . . therefore pass[ed] constitutional muster even under the most stringent standard." Id.
The court in Linares, supra, also stated that "[i]n any type of forum, from traditional public to nonpublic, it is permissible to impose content neutral time, place and manner regulations on speech that are narrowly tailored to serve a significant governmental interest and that leave open ample alternative channels for communication. . . ." (Citations omitted; internal quotation marks omitted.) Id.
In the present case, our Supreme Court has determined that the "hunter harassment" regulation at issue is content neutral, thereby agreeing with this court's decision, but has remanded the case to this court to categorize the forum at issue and then determine, based upon the forum, what the State's interest is and whether the regulation serves that interest. The court's discussion of forum categorization in Linares, supra, is useful and instructive to this court in determining the category of forum for the forest at issue. "[T]raditional public forum is property that has as a principal purpose . . . the free exchange of ideas. . . . Moreover, consistent with the notion that the government like other property owners has power to preserve the property under its control for the use to which it is lawfully dedicated, . . . . the government does not create a public forum by inaction. Nor is a public forum created whenever members of the public are permitted freely to visit a place owned or operated by the Government . . . The decision to create a public forum must instead be made by intentionally opening a CT Page 13436-h nontraditional forum for public discourse. . . . Finally, we have recognized that the location of property also has bearing, because separation from acknowledged public areas may serve to indicate that the separated property is a special enclave, subject to greater restriction. . . ." (Citations omitted; internal quotation marks omitted.) International Soc. For Krishna Consciousness v. Lee,505 U.S. 672, 679-80 (1992).
As discussed in International Soc. For Krishna Consciousness v. Lee, supra, 505 U.S. 679-80, and as argued by the state, the court's analysis of the forum must focus on the use and the purpose of the property, in this case the state's forests.
The state argued that "[t]he legislature has not dedicated the state lands as a place for public expression, but rather `for the purpose of public recreation or preservation of natural beauty or historical association.'" (State's Post Hearing Brief p. 11, quoting in part General Statutes § 23-5). General Statutes § 22a-1 provides in pertinent part:
 The air, water, land and other natural resources, taken for granted since the settlement of the state, are now recognized as finite and precious human activity must be guided by and in harmony with the system of relationships among the elements of nature. . . . the policy of the state of Connecticut is to conserve, improve and protect its natural resources and environment and to control air, land and water pollution in order to enhance the health, safety and welfare of the people of the state. It shall further be the policy of the state to . . . manage the basic resources of air, land and water to the end that the state may fulfill its responsibility as trustee of the environment for the present and future generations.
Pursuant to General Statutes § 22a-5, the Commissioner of the Department of Environmental Protection (DEP) "shall carry out the environmental policies of the state . . . the commissioner shall (a) promote and coordinate management of water, land and air resources to assure their protection, enhancement and proper allocation and utilization; (b) provide for the protection and management of plants, trees, fish, shellfish, wildlife and other animal life of all types, including the preservation of endangered species; (c) provide for the protection, enhancement and management of the public forests, parks, open CT Page 13436-i spaces and natural area preserves[.] . . ." General Statutes § 22a-5.
The DEP has promulgated regulations to protect state parks and forests and to promote the statutory policy of this state as set forth in General Statutes § 22a-1. Regulation § 23-4-1(i) provides: "Political meetings, proselytism or political or marketing surveys may be conducted only in areas and at times approved by the DEP manager in charge. Such approval shall not be unreasonably withheld."
Subsection. (c) of Regulation § 23-4-1 also prohibits hunting "in any state park or forest except as authorized by the Department of Environmental Protection."
The evidence at the hearing allows the court to make the following findings of fact: The State of Connecticut maintains and manages state park and forest land. with an policy of wildlife management and conservation of natural resources for succeeding generations of citizens of the state. The parties stipulated that certain activities on state park and forest land require licenses or special use licenses, which licenses are commonly issued. Those activities include: walkathons, bikathons, bike races, foot races, hikes, canoe races, winter sports activities, other sporting events, horseback events, campouts, boating events, orienteering, fishing and hunting events, training exercises by police departments and military organizations, and events organized by ham radio operators and model plane operators. The State of Connecticut offered testimony from George Brys, Acting Director of Wildlife Management for the Department of Environmental Protection, Don Smith, Jr., Director of Forest Management for the DEP, Edmund Zaglio, a forester and District Supervisor for DEP, Robert Friedman, Director of State Parks, Richard K. Clifford, chief of Parks and Recreation for the DEP, Mark R. Ellingwood, Wildlife Biologist with the DEP.
The DEP has recognized and dedicated state forest and unimproved park land for traditional use, that is a use established over time. Clearly, hunting, fishing, and trapping are among the traditional uses. They also are regulated, based upon the need for public safety concerns. The regulation of traditional uses also are by season, as a method adopted by the DEP for wildlife management. The DEP recognized the demand for recreational hunting, fishing, and trapping as a public interest which was significant in forming their regulations on the use of state forest and park land. Non-traditional uses, those which are not natural resource based activities or recreation require special event permits.
It was clear from the testimony that the State of Connecticut has CT Page 13436-j developed policies concerning the management of wildlife which includes hunting, fishing and trapping. The State has entrusted the exercise of that public policy in the Department of Environmental Protection (DEP). The DEP has promulgated regulations which allow other uses by permit. The defendants offered testimony concerning the use of state forests and parks for expressive or communicative activities, such as native american celebrations of culture and religion, publication of opinions on environmental issues, historical reenactments, prayer meetings, and even political fundraising events. In addition, it was uncontroverted that the state forests and parks are used by members of the public without application for a special permit.
The evidence was clear that the State had entrusted the DEP with regulating the uses in public forests and parks. The designation of forest or park has to do with size of the property, its proximity to population centers, its projected public use and projected management use within the property. The physical nature of the property contributes to that designation. State forests are large tracts with a variety of vegetation and trees. The area provides watershed protection, support of a variety of wildlife population away from humans, and provides wood for harvest. State forests provide for educational and "traditional" recreational opportunities which have been developed over time and are more passive activities. Access to the forests have always been limited by undeveloped roadways, scant parking areas, and interest. Unlike the village green, the state forests and parks are not heavily populated, and overuse is appropriately discouraged based on a respect for the quiet of nature and protection of fragile ecosystems. With the increased development of property for commercial and residential use, forest ecosystems are reduced. The encroachment into rural habitats occasions conflicts between humans and wildlife, which also must be managed by the DEP.
Most compelling of those witnesses for the defendants was Bonnie Nadeau, an expert in Wicca or witchcraft and a practitioner of that art for twenty years. She described the historic use of the state forests for the practice of witchcraft as secret venues because of fear of persecution and condemnation within the community at large. While that testimony was compelling, it is certainly true that the practitioners of witchcraft were not interested in having a public forum for free speech as much as they desired safety for their expression. They secreted themselves in the woods, where they communicated with sacred natural objects. Their choice of place for communication was not dependent upon sharing of communication with the outside world, but rather hiding their identity because of public condemnation. CT Page 13436-k
The fact that the state forests and parks are used by certain groups for expressive purposes does not change the essential nature of the public property in question. The state forests and parks have not been opened for the use by the public as a place for expressive activity. The state forests and parks have historically been utilized for recreation and preservation of natural habitat. The fact that there are roads and parking lots associated with the state forest and parks does not change that essential nature. The evidence upon which the defendants rely for their claim that the State has opened the state forests and parks for expressive and communicative activities was not availing. The testimony described expressive activities on developed land in state forests and parks, where hunting is not allowed. The acquiescence of certain other activities without a permit, and in forest land where hunting is in fact allowed, is not of sufficient extent to demonstrate to this court that the State has dedicated the land for expressive activities.
The court also finds the argument of the State compelling as to the dedication of state parks. While the use is more intensive, and there are developed areas with facilities and parking, the use is still recreational rather than expressive. Hunting is not a traditional use in the state parks which are developed, and only allowed at certain times in undeveloped state parks, that is, area without amenities to serve the public. The use of state forests and parks for "nontraditional" activities also requires supervision in light of the safety issues involved. The requirement to provide for additional sanitary facilities for a large group is obvious, and the public needs to have notice of military exercises. Certainly, the impact to the area of a walk-a-thon, organized with support volunteers is vastly different from a family taking a walk in the woods. The impact on the natural environment and habitat is an important consideration for the DEP in allowing a special permit, or in policing the areas when a use is occurring without a permit.
The court finds that the state forests and parks are non-public fora, and further finds that the content-neutral restriction contained in the statute is a permissible time, place and manner regulation of speech which is narrowly tailored to serve a significant governmental interest which also leaves open ample alternative channels for communication.
II. The State's Interest.
If the government must show that its interest is substantial, the court must determine whether the statute serves that interest and then it must determine whether the statute "unreasonably limit[s] alternative avenues CT Page 13436-l of communication." Morascini v. Commissioner of Public Safety,236 Conn. 781, 800-802, ___ A.2d ___ (1996).
"We must next determine whether the application of the statute was designed to serve a substantial governmental interest. Renton v. PlaytimeTheatres, Inc., [475 U.S. 41,] 47. We conclude that it was. As interpreted by the United States Supreme Court, this facet of the test to determine the constitutionality of a content-neutral regulation or statute is not particularly onerous. The governmental interest in protecting citizens from unwelcome noise; City Council of Los Angeles v.Taxpayers for Vincent, [466 U.S. 789], 806; in maintaining parks in an attractive and intact condition; Clark v. Community for CreativeNon-Violence, [468 U.S. 288], 296; and in attempting to preserve the quality of urban life; Renton v. Playtime Theatres, Inc., supra, 50; have all been classified as sufficiently significant to warrant a content-neutral regulation of speech." Morascini v. Commissioner ofPublic Safety, supra, 800.
"We view the government's interest in protecting the safety of its citizens to be equal to or greater than its interest in protecting citizens from unwelcome noise, maintaining the physical appearance of parks or preserving the quality of life, all of which have satisfied the substantial governmental interest test in assessing the constitutionality of a content-neutral regulation. Moreover, the government's interest in raising and preserving revenue has, in the first amendment context, been classified as both "critical"; Minneapolis Star Tribune Co. v.Minnesota Commissioner of Revenue, [460 U.S. 577] 592; and "important."Forsyth County v. Nationalist Movement, [505 U.S. 123], 136; ArkansasWriters' Project, Inc. v. Ragland, [481 U.S. 221], 231. Either one of the state's interests, standing alone, would be sufficient to justify a content-neutral regulation of speech." Id. 801.
"When the regulation is content-neutral, the means chosen by the government to further its substantial interests "need not be the least restrictive or least intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied `so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.' United States v. Albertini, [472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)]; see also[Clark v.] Community for Creative Non-Violence, supra, [468 U.S.] 297.Ward v. Rock Against Racism, [491 U.S. 781] 798-99." (Internal quotation marks omitted.) Id.
"Once we have determined a regulation to be content-neutral and CT Page 13436 designed to serve a substantial governmental interest, we must consider whether the regulation unreasonably limit[s] alternative avenues of communication. Renton v. Playtime Theatres, Inc., supra, 475 U. 5. 47." (Internal quotation marks omitted.) Morascini v. Commissioner of PublicSafety, supra, 236 Conn. 802.
The state has argued that Connecticut General Statutes Sec. 53a-183a
serves the following state interests:
1. Managing and regulating public land. "[T]he state has a legitimate and substantial interest in managing and regulating the public lands for the preservation, enjoyment or taking of wildlife; the wildlife itself; and the activities of persons on those lands, including hunters." Dormanv. Satti, 678 F. Sup. 375, 383 (D.Conn. 1988), aff'd, 862 F.2d 432 (2nd Cir. 1988).
2. Public safety. "[P]rotects hunters and those opposed to hunting from the very kind of harm which may . . . occur when [a protester] step[s] in front of [a] hunter who [is] pointing a loaded rifle at [game]." Lilburn v. Racicot, 855 F. Sup. 327, 329 (D. Montana 1991), aff'd No. 91-35310 (9th Cir. July 13, 1992).
3. Hunting is a vital forest management tool.
4. Hunting is a vital wildlife management tool.
5. Hunting serves the state's interest in securing revenues.
The state offered competent testimony concerning the policy developed by DEP for the preservation of state forest and park land. The state further offered the expert testimony of Mark Ellingwood concerning deer population and the affect of hunting on that population. The defendants countered that the weight of the evidence was contrary to that position, and that the elimination of deer population by hunting actually increased the yield during the next season. The state's expert agreed that the most efficient way to control the deer population through hunting would be for only antlerless deer to be hunted and killed, because those deer were the breeding females. The State's attempt to conduct such antlerless seasons have not been successful.
The defendants countered that testimony and the data which was the predicate for the DEP regulations with the testimony of Laura Simon. She is a consultant to the New Jersey Department of Fish, Game and Wildlife, president of the Connecticut Wildlife Rehabilitators Association, and a CT Page 13436 member of the Governor's Rabies Advisory Committee. She consults in the areas of wildlife conflict resolution and wildlife policy analysis. Her opinions were allowed by the court, and provided information concerning other ways to manage wildlife without hunting. While the opinions were valid and informative, the court did not find that the evidence outweighed the evidence produced by the state with respect to the predicate data on which the DEP made its policy. The evidence from the state and the defendants assumed wildlife management. Their methodology differed. Both would manipulate "Mother Nature."
While the testimony was instructive of the extent of data collected by the DEP with respect to the deer herds, it appeared to the court to be a subtext of what the real argument was between the parties. The State has enunciated an interest in providing a recreational opportunity to citizens who participate in the sport of hunting, so that the sport is not limited to those who have access to private lands upon which to hunt. While the defendants disagree with that policy, it appears to the court to be rational, substantial and reasonable. It is not for the court to substitute its judgment for that of the DEP on the determination of policy. The state has articulated an interest in both the enjoyment and the taking of wildlife. Furthermore, it is a policy which is uniform among the states. The regulation which allows hunting at certain times in certain places is well accepted, and is so by this court.
The state claimed that the deer population must be maintained at an acceptable level to prevent "overbrowsing" of the vegetation in the forest. The defendants claimed that the State exaggerated that claim. The general protection of the public land, including overbrowsing, contributes to the test of substantial interest. While this court does not view this interest as compelling and substantial as the first two claimed by the state, managing and regulating public land, and public safety, it is not necessary for the court's findings. The court further finds that there are revenues secured by hunting, which is a substantial state interest.
The court finds that the state has met its burden of demonstrating a legitimate and substantial interest.
The court finds further that there are alternative means of communication. The defendants have conceded that they have had their message communicated to the public by means of television and print media reports. The defendants have communicated their point of view in the DEP publication "Scope." They have engaged in public speaking in public places such as schools and libraries. They have printed materials for CT Page 13436-o dissemination. The defendants are able to publically spread their message to more people in that fashion, than in confronting hunters in the forest.
The court finds that the state lands where hunting is allowed are not public fora and that Connecticut General Statutes Sec. 53a-183a is narrowly tailored to serve a substantial governmental interest.
DRANGINIS